186 So.2d 571

Beuford G. JACKA

v.

OUACHITA PARISH SCHOOL BOARD.

No. 48020.

May 2, 1966.

Rehearing Denied June 6, 1966.

Theus, Grisham, Davis, Leigh & Brown, J. Bachman Lee, Oliver, Digby & Fudickar, Fred Fudickar, Jr., Monroe, for applicant.

Alvin B. Rubin, Sanders, Miller, Downing, Rubin & Kean, Baton Rouge, for amicus curiae.

Albin P. Lassiter, Dist. Atty., Robert W. Kostelka, Asst. Dist. Atty., for respondent.

McCALEB, Justice.

Plaintiff brought this suit to recover $27,005.57, allegedly the balance due him by the Ouachita Parish School Board under a written contract employing him to perform architectural services in connection with the construction of an addition to the Drew School and the erection of an elementary and junior high school, in Ouachita Parish.

The school board admitted the execution of the contract and the performance of the architectural services by plaintiff. However, by way of reconventional demand, it asserted that, during the course of construction of the Riser Junior High School, it was compelled to amend its contract with

the contractor (Jesse F. Heard & Sons, Inc.) to include an additional cost of $46,913.37, which cost was attributable solely to plaintiff's fault in preparing improper and defective specifications for the construction of the school. Hence, the board alleged the total due plaintiff for services rendered under the contract, after deducting therefrom its damages of $46,913.37, was only $13,563.51, and that since it had previously paid plaintiff $36,286.13, plaintiff was indebted unto it in the sum of $22,722.62 with legal interest thereon from date of judicial demand until paid, for which judgment was accordingly prayed.

Plaintiff in answer to this reconventional demand denied any negligence or fault. Alternatively, he averred that he was furnished a topographical map or survey of the school site by the defendant board through its member and agent, Fred Riser, upon which he relied in the preparation of the plans and specifications; that the board impliedly warranted the correctness of this map or survey and that it is now estopped from denying the accuracy of the map or from asserting negligence on his part.

After a trial in the district court on the issues thus formed by the pleadings, there was judgment for plaintiff as prayed for with interest and costs, and the reconventional demand of the school board was dismissed. On appeal to the Court of Appeal, Second Circuit, the decision was reversed, and judgment was rendered in favor of the

school board on its reconventional demand for $2,674.45 with legal interest thereon from judicial demand. See Jacka v. Ouachita Parish School Board, 179 So.2d 923. Plaintiff then applied here for certiorari. The writ was granted, and the case has been argued and submitted for our determination.

We find that the record establishes the following facts: On April 25, 1962, plaintiff was employed by the board to furnish architectural services in connection with the building of an addition to Drew School and construction of a new elementary and junior high school to be named Riser Junior High School. The terms of this contract provide:

"* * * The Architect's professional services shall consist of and include, among other services which are not specifically mentioned here, the necessary conferences; the preparation of preliminary studies and plans, working drawings, specifications, large-scale detail drawings for architectural, structural, plumbing, electrical and other mechanical work, *engineering services* * * *

"4. *The Architect agrees to supply all engineering and other special services necessary to complete the work.* No extra fees shall be charged for such services unless agreed to in writing by the Owner before such services are contracted for and/or rendered." (Italics ours.)

Plaintiff, having previously secured a topographical map of the site of the Drew School addition at the school board's expense, endeavored to contact the Superintendent and Assistant Superintendent of defendant board for the purpose of obtaining a topographical survey of the Riser construction site, but was unsuccessful. Mr. Fred Riser, the member of the school board from the ward in which the new school was to be located, made visits to the office of plaintiff for the purpose of checking on the progress of the work and requested information concerning the delay in starting the drawing of plans and letting a contract. Plaintiff informed Mr. Riser on these occasions that he was attempting to secure a topographical survey from the board and that he could not prepare his drawings without it. A day or so later, Mr. Riser appeared at plaintiff's office with such a survey. Thereupon, plaintiff used this survey for the drawing of the plans and specifications.

After construction had begun, it was discovered by the contractor (Jesse F. Heard & Sons) that the footings shown on the working drawing and specifications could not be placed on the ground due to a discrepancy between the layout of the building and the actual topography of the existing site. The structural engineer employed by plaintiff, Lester High, was then instructed by plaintiff to prepare a topographical map in order to ascertain the dif-

ferences between the true elevations of the existing ground and the elevations as shown on the map furnished by Mr. Riser. On the basis of Mr. High's survey, plaintiff prepared a new grading and paving plot plan which was given to the contractor for an estimate. A supplemental estimate in the amount of $28,000.00 was submitted by the contractor, which sum represented the amount necessary to bring the existing site up to the proper grade.

In addition to this change, the school board decided to raise the elevation of the entire school one foot, and the contractor submitted a bid to the board of $46,913.37 to perform the necessary grading work and to raise the elevation of the building. This proposal was accepted by the defendant board.[1]

In his written reasons, the trial judge found that plaintiff had established his contention that it was the intention of the parties to the contract that the topographical survey was to be furnished by the defendant board. The judge pointed out that, in addition to his own statement, plaintiff produced two prominent architects, who testified that it was the common practice in the Monroe area for the owner to furnish the architect with a topographical map unless the architect is requested by the owner to have someone of the architect's choice prepare it at the owner's expense (as was done by the board in the present case with respect to the topographical survey of the Drew School site). Further, the judge concluded that the school board was bound by Mr. Riser's act in furnishing plaintiff with a topographical map, inasmuch as the board made no attempt to contest his apparent authority either by official action or testimonial evidence of any of its members or officers.

The Court of Appeal based its opinion exclusively on the provision of the contract, which stipulated that it was incumbent on the architect " * * * to supply all engineering and other special services necessary to complete the work." It stated that this provision was clear and unambiguous and that the obligation to perform all engineering services included the furnishing of a topographical map and that, since plaintiff failed in this respect, " * * * he cannot be excused for accepting an incorrect map from another because of custom."

We think the Court of Appeal erred in holding that plaintiff's contractual obligation to supply all "engineering and other special services" was of such unequivocal import that its language supports an intention to include the furnishing of a topographical survey of the site—for such a map may well be regarded as, principally, a surveying service or, in any case, as a

1. A prior bid of $57,500.00 was submitted but the action taken on this proposal was questioned by the District Attorney, (the legal advisor of the school board) and the bid was then reduced to $46,913.37 and accepted.

service to be performed either by a civil engineer or a surveyor. The contractual provision, as we read it, broadly embraces engineering services "necessary to complete the work" which connotes all structural engineering services essential for the erection of the structure. It may also be understood to include surveys of the sites and soil boring tests, but we cannot say with any degree of certainty that the terms used in the contract are so clear and explicit that they express that the parties intended that such surveys and soil tests were to be considered as engineering services. It follows, then, that the third paragraph of Article 1945 of the Civil Code, providing that "the intent of the parties is to be determined by the words of the contract when these are clear and explicit and lead to no absurd consequences," is inapplicable. Pertinent here, we think, is Article 1950 of the Code which declares in substance that, if there is any doubt as to the meaning of the terms or words used in agreements, the court must endeavor to ascertain " * * what was the common intention of the parties, rather than to adhere to the literal sense of the terms." It is the cardinal rule, as stated by Article 1956 of the Code, that when the intent of the parties is doubtful, the construction put upon the contract by the parties themselves furnishes the rule for its interpretation.

In the case at bar, the parol evidence as to the understanding of the parties—that the board was to supply a topographical survey of the sites—was admitted without objection, and on this ground alone, the evidence may be considered as showing intent. Moreover, we think the evidence was otherwise properly considered by the trial judge under Article 1956 of the Civil Code as showing that the parties understood and contemplated that the term "engineering services" to be supplied by the architect did not embrace the furnishing of a topographical map of the site. The crucial evidence of intent in the case at bar is that the board instructed plaintiff to have his civil engineer make such a survey in order to prepare the plans for the addition to the Drew School and that the engineer was paid by the board for this survey. Corroborative of this understanding is the fact that the board employed Eustis Engineering Company to make soil boring tests of the Riser School site and paid for these services. Also, the undisputed evidence of custom avouched by plaintiff and two other architects—that in the Monroe area, the owner and not the architect supplies a topographical map of the site—gives support to this position.

Since we find that it was the duty of the board to provide such a survey of the site, the next question presented is whether or not Mr. Riser had authority to furnish the topographical map to plaintiff. We have no hesitancy in holding that the trial judge was correct in holding that he did have au-

thority to do so. Indeed, the failure of the school board to offer evidence that Mr. Riser acted without its knowledge and approval and the fact that it assumed the obligation of supplying a similar survey as to the Drew School site would seem to foreclose further discussion of this issue.

Finally, we address our attention to the question of whether plaintiff was nevertheless at fault in using the survey supplied by Mr. Riser for preparing the construction plans and specifications for the erection of the high school. The board contends that plaintiff as an architect was grossly negligent in using this map because it had been prepared some five years previous to the making of the contract in suit; that it depicts a large area where a proposed subdivision was to be located and that the land on which the school building was to be erected comprised only a small portion of the survey, which should have put plaintiff on notice that it was not intended to correctly exhibit the contours and elevations of the land for construction purposes.

The map was prepared by a Mr. J. M. Norris, a registered land surveyor, and bears his seal and the notation "West Heights Subdivision." According to Mr. Norris, who testified for the board, the map was made for the purpose of securing an FHA loan on the proposed land development in 1957, and the contours thereon were delineated only to show drainage and not for construction on any particular por-

tion of the land. Both Mr. Norris and Mr. Nash (a civil engineer who testified for defendant) stated that, before making use of this topographical survey, it was essential to determine the purpose for which it was made—that is, that if a "topo" is being made for drainage of a large area, it is based on shots which are spaced at a considerable distance, sometimes as much as 400 feet, whereas if a "topo" is being made for a construction project, the shots should be spaced no more than 50 feet and, if there are unusual conditions of terrain, they should be spaced 25 feet. These witnesses further indicated that plaintiff should have known that the Norris map was for drainage purposes only since there is a notation on the map that the scale is 1" equals 200'.

■ While this testimony is ingeniously critical, we do not think it should prevail as the controlling factor under the circumstances of this case. Mr. Norris is a qualified land surveyor, and we perceive no compelling reason to conclude that plaintiff was not entitled to rely on the accuracy of the contour lines and elevations shown on his map. The fact that the map shows that it is drawn to a scale of 1" for each 200' does not indicate plaintiff should have suspected that the elevations and contours exhibited thereon were shot from a distance of 200 feet or, for that matter, at a distance of more than 25 feet. Of even less significance is the fact that the map was five years old when it was delivered to plain-

tiff—for it is difficult to perceive why its age or the extent of the area surveyed has any relevance to the accuracy of the surveyor's findings. The witnesses for plaintiff testified positively that, as architects, they found no reason to question the correctness of the map, and we believe that this testimony should prevail.

After an examination of the entire record, we are satisfied that the board's claim in reconvention is wholly without merit.

For the reasons assigned, the decision of the Court of Appeal is annulled and reversed, and the judgment of the trial court is reinstated and affirmed.

HAMITER, J., dissents, being of the opinion that the judgment of the Court of Appeal is correct.

186 So.2d 576