COLE, Judge.
W. N. Bergeron & Sons, a partnership owning “Hard Times Plantation” and appearing through its managing partner, S. W. Bergeron, brought suit against Caldwell Sugar Co-op, Inc., for the alleged breach of a written contract entitled “Marketing Agreement” entered into between the parties. Caldwell appeals the judgment rendered in favor of Bergeron. We affirm.
As stipulated between the parties, Ber-geron and Caldwell entered into a written contract entitled “Marketing Agreement,” dated August 8, 1969. Under the agreement, Bergeron was obligated to deliver to Caldwell, all of the cane grown on “Hard Times Plantation” for a period of five years, beginning with the 1969 crop, excluding one-fifth of the total grown by Berger-on. In return, Caldwell was to pay “patronage dividends” to Bergeron consisting of a pro rata share of the profits from the mill operation based upon the amount of cane delivered by the member.
According to the written stipulation of the parties:
“5) W. N. Bergeron and Sons complied with all the provisions of the marketing agreement during the years 1969, 1970, 1971, 1972, and 1973.
“6) For the sugar cane delivered to the sugar mill of Caldwell Sugars Co-op, Inc. from W. N. Bergeron and Sons ‘Hard Times Plantation’ covered by the Marketing Agreement for the crop years 1969 through 1972 defendant paid to plaintiff the total amount due under Article 6 of the Marketing Agreement.
“7) For the crop year 1973 defendant paid to plaintiff patronage dividends on only one-fifth (Vs) of the sugar cane delivered under the Marketing Agreement.
“8) The patronage dividend rate of payment for crop year 1973 was $3.7404 per standard ton of sugar cane delivered under Marketing Agreement.
“9) The total of sugar cane delivered to Caldwell Sugars Co-op, Inc. sugar mill from W. N. Bergeron and Sons ‘Hard Times Plantation’ from the crop year 1973 was 4733.50 standard tons of sugar cane.
“10) Caldwell Sugars Co-Op, Inc. paid patronage dividend to W. N. Bergeron and Sons from the crop year 1973 based on 945.22 standard tons amounting to $3535.50.
“11) The amount in dispute is $14,-169.68 obtained by applying the balance of the crop delivered of 3788.28 standard tons of sugar cane against the patronage dividend rate of $3.7404 per standard ton of sugar cane all for the crop year 1973.
“12) The four-fifths (Vs) of the crop in question was considered ‘member cane’ in each year of operation under the Marketing Agreement as interpreted mutually by the parties up until crop year 1973.” (Record, pp. 73, 74)
After paying Bergeron patronage dividends for all of the cane delivered for four of the five contract years, Caldwell refused payment in the fifth year. Instead, Caldwell paid dividends based on one-fifth of the cane delivered from “Hard Times,” which is customarily the landlord’s share of the crop. This action by Caldwell was initiated in response to the decision- in Iberia Sugar Cooperative, Inc. v. United States, 5 Cir., 480 F.2d 548 (1973).
*1056 Under the Internal Revenue Code, 26 U.S.C.A., § 1382(b), a farmer’s cooperative association like Caldwell, may exclude from its taxable income amounts paid to its members, such as Bergeron, as patronage dividends. However, under the Iberia Sugar Cooperative case, the cooperative may not exclude from its taxable income those amounts paid to members based on the nonmember tenant’s share of the cane delivered. When faced with this decision affecting its tax liability for amounts paid to members with respect to the non-member tenant’s share of the cane delivered, in the final year of the contract, Caldwell, acting on the advice of its accountants, refused to pay Bergeron the dividends based on the total cane delivered so as to avoid tax exposure with respect to that portion attributable to the non-member tenant’s share of the cane.
Caldwell argues that to pay Bergeron a dividend based on the entire amount of cane delivered from “Hard Times” would be a violation of federal tax law. This approach is not accurate because such a payment to Bergeron would not be illegal. Caldwell would merely be subject to tax liability for that portion of the dividend paid which was based on the non-member’s share of the cane.
To justify its failure to pay Bergeron patronage dividends for the entire amount of cane delivered in 1973, defendant-appellant Caldwell underscores the following portion of the marketing agreement:
“2. The Association buys and the Grower sells and agrees to deliver to the Association all sugar cane grown by him in the State of Louisiana, for a period of 5 years from the date of this agreement, beginning with the 1969 crop, including that produced or acquired by or for him as landlord or tenant, lessor or lessee. * * * This contract is intended by the parties to pass absolute title as far as possible to. all sugar cane as soon as the same shall have a potential existence, but they shall be at the risk of the Grower until delivery. Grower warrants that he has not sold or contracted to sell to any other party any of the cane covered by this contract.” (Record, p. 4)
As the trial court correctly pointed out, apparently there is some doubt as to the meaning of the above-quoted contract language. The debate centers upon the question of whether the marketing agreement covers all cane grown by the member on his land or only the one-fifth of the crop, customarily the landowner’s share.
Defendant contends that because four-fifths of the cane delivered belonged to Bergeron’s tenant, it was not covered by the contract since Bergeron could not pass title to the cane to Caldwell. There is nothing in the record to indicate that Ber-geron was not, in fact, the owner of the cane. The parties merely stipulated that the cane delivered to Caldwell came from “W. N. Bergeron & Sons ‘Hard Times Plantation.’ ” (Stipulation 9, p. 74, Record) We will assume for argument, as Caldwell alleges, that Bergeron as landlord owned one-fifth of the cane delivered, and Berger-on’s non-member tenant had title to four-fifths of the cane delivered.
When confronted with disputes as to the interpretation to be given language in a contract, the court is guided by various codal axioms. See e. g., La.C.C. arts. 1901, 1945, et seq. A contract is the law between the parties, and except as authorized by law, may not be revoked unless by mutual consent of the parties. La.C.C. arts. 1901, 1945. In situations, as in the instant case, when the meaning of the contract or agreement is doubtful, the court must seek- to determine the mutual intention of the parties. La.C.C. art. 1950.
However, the determination of what the common intention of the parties was in reaching an agreement is often questionable. In such situations C.C. art. 1956 is relevant:
“When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation.”
*1057 See, Jacka v. Ouachita Parish School Board, 249 La. 223, 186 So.2d 571, 574 (1966).
In the instant case, it is clear from the stipulation mutually entered into by the parties that until 1973 all the cane delivered to Caldwell by Bergeron from “Hard Times” was “considered ‘member cane’ as interpreted mutually by the parties.” Both parties performed consistently with this interpretation of the agreement for four years under the contract. Therefore, as stated by the trial court:
“ * * * It was obviously the intent of the parties to the Marketing Agreement that the plaintiff would receive a patronage dividend based on the entire crop grown on his land delivered to the mill. * * * ” (Reasons for Judgment, Record, p. 80)
Further, in cases of dispute concerning the interpretation of language in written contracts, generally any ambiguity in meaning is interpreted against the party who has prepared the contract. C.C. art. 1957. The “Marketing Agreement” was a standard form contract used by Caldwell in contracting with its member growers.
Therefore, for the foregoing reasons, the judgment of the trial court is affirmed. The costs are to be assessed to the appellant.
AFFIRMED.