408 So.2d 888 (1981)
In the Matter of the SUCCESSION OF Ted F. DUNHAM, Sr.
No. 81-C-0140.
Supreme Court of Louisiana.
September 8, 1981.
Rehearings Denied October 9, 1981.
*889 Ashton L. Stewart, of Stewart & Preis, J. Huntington Odom, of Kennon, White & Odom, Baton Rouge, for applicant.
Victor A. Sachse, III, and Claude F. Reynaud, Jr., of Breazeale, Sachse & Wilson, James D. Thomas, II, of Avant, Wall, Thomas, Riche & Falcon, Thomas H. Benton, and Rosemary H. Williams, of Benton, Benton & Benton, David M. Ellison, Jr., Baton Rouge, for respondents.
Robert A. Howthorne, Jr., Davis A. Gueyman, Warren L. Mengis, in pro. per.
CALOGERO, Justice.
This involved lawsuit arises out of a dispute in the Succession of Ted F. Dunham, Sr., prompted chiefly by conflicting claims to stock in a closely held family corporation, Anderson-Dunham, Inc. The chief adversaries are Katherine O. Hall Dunham, Ted F. Dunham, Sr.'s, surviving spouse and succession executrix, on the one hand, and Ted F. Dunham, Jr., and Richard E. Dunham, Ted, Sr.'s, two sons from a prior marriage, on the other. The issues involve the ownership of certain shares of stock in the Anderson-Dunham corporation, the removal of Katherine as executrix of the estate and the removal of Katherine and Billy J. Alexander as co-trustees of certain trusts created by the deceased in his will.
The facts leading up to and surrounding this litigation are essentially as follow:
Ted F. Dunham, Sr., was originally married to one Mayola Dunham. Of that marriage two sons were born, Ted, Jr., and Richard. Ted, Sr., was legally divorced from Mayola on October 18, 1937. During this time Ted, Sr., was engaged in the lumber business in Oklahoma where he was domiciled. Shortly after the divorce Ted, Sr., moved to Louisiana. On December 9, 1937, Ted, Sr., James L. Anderson and Katherine Hall formed the Anderson-Dunham Concrete Co., Inc., presently Anderson-Dunham, Inc. It was incorporated on that date. It is generally agreed that Anderson put up some money and was issued on December 10, 1937, 500 shares of Anderson-Dunham stock (Certificate # 1). Katherine contends that she also put up a considerable amount of money (about $5,000.00) and was issued a stock certificate for 490 shares of stock. (Certificate # 3). *890 Ted, Sr., was issued at that time a stock certificate for 10 shares of stock (Certificate # 2). On that same day, December 10, 1937, Ted, Sr., endorsed his stock over to Katherine and she in turn endorsed hers over to Ted, Sr. She testified at trial that the reason for the reciprocal endorsements was to facilitate financing for the corporation. Anderson-Dunham is a Louisiana Corporation and Ted, Sr., and Katherine were domiciled in Louisiana, while Anderson was presumably domiciled in Oklahoma, although there is testimony that he was living in Texas.
On August 31, 1938, James L. Anderson was issued an additional 500 shares of stock in Anderson-Dunham (Certificate # 4). On that same day, August 31, 1938, Ted, Sr., was issued an additional 500 shares (Certificate # 5). And on October 26, 1938, an additional 10 shares were issued to Katherine (Certificate # 7).
On August 5, 1939, Ted, Sr., and Anderson entered into a contract of sale, or to sell, Anderson's interest in the corporation, 1000 shares represented by Certificate Nos. 1 and 4,[1] to Ted, Sr., because Anderson was "dissatisfied with the management of the affairs of said Company and, in order to permit said Company to continue to operate and to remove internal dissension." The price was set at $40,000.00 for Anderson's 1000 shares, to be paid in monthly installments at the rate of $412.50 per month. Final payment did not occur until 1943. At that time the certificates were endorsed over to Ted, Sr. Meanwhile, on April 24, 1940, Ted, Sr., had married Katherine.
In 1969 Dunham purchased a 30,000 acre ranch in Marfa, Texas. 22,000 acres of the ranch are listed as an asset of a corporation known as Dunham Land, Inc. That corporation was set up in 1969, apparently to purchase this ranch, and the shares of the corporation were issued as follows:
350 issued to Ted, Sr. 300 issued to Ted, Jr. 350 issued to Richard
All three of the certificates were endorsed in blank and a new certificate was issued to Anderson-Dunham, Inc. for 1000 shares of Dunham Land, Inc. Although disputed at trial, Dunham Land, Inc. was found by the trial court to be a wholly owned subsidiary of Anderson-Dunham.[2]
On February 12, 1973, at a directors meeting of Anderson-Dunham, Inc., the following resolution was adopted:
BE IT RESOLVED that on the death of any stockholder of the Corporation, the Corporation shall redeem or purchase as treasury stock so much of the deceased stockholder's stock as his administrator or beneficiary may desire to sell. In no case shall the price of the stock be less than its book value as determined in the Corporation's previous certified audit or greater than 105% of such book value.
This resolution was signed by Ted, Sr., Katherine and Alexander.
Ted, Sr., died on April 17, 1974. He had made a will in which, after making several specific bequests, he left one-half of the total value of his estate in two trusts, one each for Ted, Jr., and Richard. With respect to the remainder of the estate, he *891 instructed that it be equally divided one-sixth each, into six trusts for six of his grandchildren. He further named Katherine executrix of the estate and Katherine, Billy J. Alexander and Fidelity National Bank of Baton Rouge as co-trustees of the eight trusts. Fidelity declined acceptance of the trust and Louisiana National Bank of Baton Rouge was appointed in Fidelity's place.
On May 3, 1977, Katherine, as executrix, wrote to the corporation and requested that 394 shares of Ted, Sr.'s, separate stock be redeemed by the corporation, as per the above resolution, and she asked of the corporation, which her vote controlled, the price it would be willing to pay. On May 4, 1977, the corporation adopted a resolution consistent with the February 12, 1973, resolution noted above authorizing the redemption of 394 shares at 105% of the book value from an April 1977 audit. The corporate fiscal year was from February 28 to February 28. On May 10, 1977, Katherine filed a petition in district court seeking authorization to sell the stock back to Anderson-Dunham, that is, to permit the stock's redemption. Katherine as executrix for the succession was not obligated to sell the stock back to the corporation. The resolution only directed the corporation to buy the stock if it was offered to it by the administrator of any deceased shareholder. Katherine contended that the sale was necessary to secure cash in order to pay the succession debts and to secure a tax advantage under 26 U.S.C. § 303.[3] Richard opposed the sale and filed a petition for an injunction to prevent it. Although Richard contended at trial that the assets of the corporation had not properly been valued for the audit, that the corporation was about to acquire $500,000.00 in other assets, and that earned assets from the time of the audit to date should be added prior to fixing the price of the stock, the trial judge ruled in favor of Katherine denying the injunction and authorizing the sale. This judgment was rendered on August 8, 1977, and the sale was authorized at 105% of the book value from the April 1977 audit, or $1,519.15 per share.
Richard did not appeal from this ruling suspensively and his devolutive appeal from the judgment authorizing the sale, although granted, was later dismissed as moot because the sale took place before the appeal would have been concluded. The sale took place on February 27, 1978, the day before the close of the next fiscal year. The Court of Appeal noted in its dismissal that Richard's right to seek to annul the sale and/or seek damages was reserved, stating:
The appeal is dismissed as moot with full reservation of Appellant's rights to proceed against the Appellee and/or Anderson-Dunham, Inc., to annul the sale of stock or against Appellee for alleged breach of Appellee's fiduciary duty as trustee or testamentary executrix of decedent's estate. 359 So.2d 674, 676 (La. App. 1st Cir. 1978).
During this entire time, Katherine was acting as executrix of the estate and as an officer and director of the corporation as well. She had not yet accepted the trusteeship of the trusts. Her motion for confirmation as trustee was not filed until May 31, 1978, well after the redemption of February 27, 1978.
Richard, now joined by Ted, Jr., filed a supplemental and amending petition in the district court to have, among other things, the sale or redemption of the stock annulled. They did not request damages in that petition. The trial court held in favor of Katherine and refused to set aside the redemption. There were other issues presented in the trial court and considered on appeal. 393 So.2d 438 (La.App. 1st Cir. 1980). However, since only Katherine has sought writs in this Court the only issues presented for our consideration (and this does not include the annullment of the stock sale) are the following:
(1) Ownership of 490 shares of Anderson-Dunham stock issued to Katherine but *892 endorsed to Ted, Sr., represented by Certificate No. 3. (The trial court held that these shares belonged to Katherine, but the Court of Appeal reversed, holding that they belonged to Ted, Sr.'s, separate estate.)
(2) Ownership of 1000 shares of Anderson-Dunham stock purchased by Ted, Sr., from Anderson with the first payment and contract having occurred before Ted, Sr.'s, marriage to Katherine, but with numerous payments and final payment being after the marriage. (The trial court held that these shares belonged to Ted, Sr.'s, separate estate and the Court of Appeal affirmed.)
(3) Ted, Jr.'s, and Richard's right to seek damages from Katherine as executrix of the estate for failing to properly manage the estate, in that she sold the 394 shares of stock back to Anderson-Dunham by way of redemption. (The trial court held that the redemption could not be set aside and the Court of Appeal affirmed, reserving to Ted, Jr., and Richard their right to sue for damages.)
(4) Removal of Katherine as executrix of the estate. (The trial court refused to order Katherine removed as executrix but the Court of Appeal reversed, ordering her removed.)
(5) Removal of Katherine and Alexander as co-trustees. (The trial court ordered them removed as to Ted, Jr.'s, and Richard's trusts only. The Court of Appeal affirmed that ruling of removal, but amended the judgment to order both parties also removed as co-trustees to the grandchildren's six trusts.)
The issues before us are thus reduced to five and will be discussed in the foregoing order in this opinion.

OWNERSHIP OF 490 SHARES OF ANDERSON-DUNHAM STOCK
Mrs. Katherine O. Hall Dunham, executrix of Ted Dunham's estate, contends that 490 shares of Anderson-Dunham stock represented by Certificate No. 3 are her separate property. Ted, Jr., and Richard argue to the contrary that the stock is their father's separate property.
For purpose of clarity we repeat certain of the pertinent facts. On December 9, 1937, in Louisiana, Ted, Sr., James L. Anderson and Katherine O. Hall (Mrs. Dunham prior to her marriage to Ted, Sr.) formed the Anderson-Dunham corporation and chartered it on that date. The following day, shares of stock were issued in the corporation as follows:
500 sharesissued to James. L. Anderson represented by Stock Certificate No. 1.
10 sharesissued to Ted F. Dunham, Sr. represented by Stock Certificate No. 2.
490 sharesissued to Katherine O. Hall represented by Stock Certificate No. 3.
On the same day as the issuance, December 10, 1937, Ted, Sr., endorsed Certificate No. 2 to Katherine and Katherine endorsed Certificate No. 3 to Ted, Sr.
Katherine testified at trial that she and Ted, Sr., agreed that she would endorse the 490 shares over to him simply to facilitate financing for the corporation, with the understanding that she would continue to be the owner of the stock. She further testified that consistent with this, she attempted to eradicate the endorsement after it was no longer needed, and because the stock book, evidencing her ownership of the shares, could not be found. The certificates were kept in a safe at Ted, Sr.'s, office until after the parties married and acquired a home, at which time the certificates were brought home and kept in a safe there. Katherine contends that she borrowed money to invest in the corporation at its inception and that the shares were issued to her in return for that consideration. She also contends that at no time was there any intention on her part to donate the stock to Ted, Sr.
In support of her contentions, Katherine introduced into evidence minute entries from some of the corporate meetings.
The minutes of a shareholder's meeting held on January 12, 1943, list Certificate No. 3, representing 490 shares as "standing in the name of Katherine O. Hall Dunham." *893 Also, the proxies for that stockholders' meeting were introduced into evidence. The proxy by Katherine is for 500 shares (the 490 in question plus an additional 10 shares, ownership of which is not here disputed). The proxy for Ted, Sr., listed him as owner of 520 shares (the 10 shares issued to him on December 10, 1937 represented by Certificate No. 2, 500 shares issued to him on August 31, 1938, represented by Certificate No. 5 and 10 shares issued to him on October 19, 1942 represented by Certificate No. 8). This supports Katherine's contention that both she and Ted, Sr., treated the 490 shares represented by Certificate No. 3 as owned by Katherine.
Minutes of a stockholders' meeting held on December 10, 1954, refer to 500 shares standing in the name of Katherine Dunham. Significantly, these minutes are signed by Ted, Sr.
Stock Certificate No. 3 for the 490 shares does reflect evidence of the endorsement and the attempt to eradicate it. Katherine testified at trial that she did attempt to eradicate the endorsement, but it was with the full knowledge and consent of Ted, Sr., for the purpose of clearing up any confusion about the ownership of the shares.
The trial court, after hearing the testimony and examining the evidence, concluded that the 490 shares represented by Certificate No. 3 were Katherine's separate property. The Court of Appeal, relying solely on the Uniform Stock Transfer Act, more particularly R.S. 12:601, held that the 490 shares were Ted, Sr.'s, separate property.
R.S. 12:601 of the Uniform Stock Transfer Act provides as follows:
The person, firm or corporation, in whose name the certificate representing shares of stock stands, or to whom a certificate is endorsed, whether in full or in blank, and who has possession of said certificate, shall be regarded as the legal owner. The legal owner has full power to pledge, sell or otherwise dispose of said stock. No person, corporation, firm or transfer agent shall be responsible to any one claiming any interest in, or ownership of, said shares, or any part thereof, by virtue of any undisclosed or latent legal or conventional title or interest therein.
The purpose of this statute, rather than to provide the requirements for a valid and irrevocable transfer of stock, is to provide protection for third persons who deal with the record owners of the stock and also to establish when one may be considered the record owner. Finn v. Ponsaa, 308 So.2d 352 (La.App. 4th Cir. 1975), writs denied 313 So.2d 238 (La.1975). In further support of this premise are a number of cases which hold that the Uniform Stock Transfer Act is not the exclusive means of transferring stock or evidencing ownership of it. Broussard v. Broussard, 340 So.2d 1309 (La.1976); Primeaux v. Libersat, 322 So.2d 147 (La. 1975); Dardeau v. Fontenot, 326 So.2d 521 (La.App. 3rd Cir. 1976); Smith v. Smith, 311 So.2d 514 (La.App. 3rd Cir. 1975), writs denied, 313 So.2d 840 (La.1975); Richard v. Foods and Services, Inc., 162 So.2d 213 (La. App. 1st Cir. 1964); Alley v. Miramon, 614 F.2d 1372 (5th Cir. 1980). Therefore, as has been previously held, although R.S. 12:601 may protect third persons dealing with the apparent owner of the stock, as between the parties compliance with R.S. 12:601 does not necessarily indicate a transfer of ownership. Rather, we must look to the intent of the parties. Alley v. Miramon, supra; Broussard, supra; and Primeaux v. Libersat, supra.
In Primeaux v. Libersat, supra, the Court was faced with a similar question concerning the ownership of certain shares of stock. Therein this Court noted "that although this form of donation is exempt from the external formality of a notarial act otherwise required by Article 1536 [of the Civil Code], it is subject to the substantive rules of donation ...." Thereafter, in Broussard supra, we reiterated our holding that although the stock transfer legislation provided an additional method of making a donation of stock, a party seeking to prove the donation must nevertheless establish the actual character of the transaction. We held:
[E]ven in a case where compliance with the stock transfer legislation may substitute *894 for the codal formalities of a donation, the substantive requirements of divestment and donative intent must be fulfilled in order to effect a valid donation.
Therefore, notwithstanding an apparent transfer of the stock in conformance with the stock transfer act, as between the parties, whether a valid donation has been made depends on the intent of the parties involved in the transfer.
In the present case, there has been no showing of an intent on Katherine's part to donate her shares of stock to Ted, Sr. To the contrary, the evidence supports Katherine's contention that there was no donation. Katherine herself testified that the endorsement on Certificate No. 3 to Ted, Sr., was for the sole purpose of facilitating financing arrangements, and that at no time did she intend to transfer ownership of the shares to Ted, Sr. Consistent with this testimony are the minute entries and proxy statements referred to above, both referring to Katherine as late as seventeen years after the endorsement as the owner of the shares represented by this stock certificate.
The trial court, after hearing the testimony and examining the evidence, held that no intent to donate the shares had been proven and that the shares, therefore, belonged to Katherine. There is no showing that this determination is clearly wrong and thus it was error on the part of the Court of Appeal to reverse that finding. Therefore, we hold that the 490 shares of stock represented by Certificate No. 3 belong to Katherine Dunham as her separate property.

OWNERSHIP OF 1000 SHARES OF ANDERSON-DUNHAM STOCK
Mrs. Dunham as executrix of the estate inventoried the 1000 shares of Anderson-Dunham stock represented by Stock Certificate Nos. 1 and 4 as community property in the descriptive list filed in the succession. The deceased's sons contend that these shares should properly have been classified as Ted, Sr.'s, separate property.
The facts relating to this issue are as follows. On December 9, 1937, the Anderson-Dunham corporation was chartered in Louisiana. Katherine, Ted, Sr., and James L. Anderson were the sole incorporators. In an attempt to resolve certain management disputes between Ted, Sr., and Anderson, Anderson agreed to sell out his interest in the corporation to Ted, Sr. Thus, by a written agreement entered into on August 5, 1939, between Ted, Sr., and Anderson, Anderson agreed to sell his 1000 shares in the corporation to Ted, Sr. In the instrument it was provided, among other things, that payment of the purchase price would be made over a period of time and title to the shares was to remain in the vendor until final payment was made. At the time the agreement was entered into Anderson was domiciled in Oklahoma and Ted, Sr., in Louisiana. Although there was testimony at trial that Anderson was residing in Texas at the time the agreement was entered into, the agreement itself states that it was entered in Oklahoma. The final payment of the purchase price was made in 1943. Prior to that time, on April 24, 1940, Ted, Sr., had married Katherine. Katherine contends that title to the shares was not transferred until after the marriage, and that consequently the shares are community property.
Both the trial court and the Court of Appeal held that these shares of stock were Ted, Sr.'s, separate property. For the reasons which follow, we affirm that ruling.
At the outset it should be noted that none of the parties have argued to this Court that Oklahoma law is to be applied in this case. Rather, the issue has been argued under the assumption that Louisiana law is controlling, as was held by the Court of Appeal, and will, therefore, be treated accordingly.[4]
*895 The difficult problem involved in determining whether the 1000 shares were acquired in 1939 at the inception of the agreement entered into between Ted, Sr., and Anderson relative to the sale of the stock (and thus is arguably Ted, Sr.'s, separate property) or in 1943 when Anderson endorsed the stock over to Ted, Sr., (and thus is arguably Ted, Sr.'s, and Katherine's community property) arises because of some ambiguity in the contract itself.
The contract was titled merely "Agreement". In its prefatory language it referred to Ted, Sr.'s, "proposing" to buy Anderson's stock, and the necessity that such proposed sale and purchase to be a "conditional sale." The agreement provisions also spoke of an agreement to sell and agreement to buy on credit terms. There was a provision concerning Anderson's retention of "possession and title" to the shares until the purchase price had been fully paid in cash, with Anderson being obligated to deliver (and endorse) the shares to Ted, Sr., only after the price had been fully paid. While it is true that these provisions seem to indicate that the contract was merely a contract to sell, or perhaps a conditional sale, the other provisions therein indicate fairly clearly that the contract was rather one of a present sale with the seller-creditor retaining only a security interest in the property, not ownership of it.
The contract specifically provided that the purpose of the agreement was to solve the ongoing management disagreements between Anderson and Ted, Sr., "in order to permit said Company to continue to operate and to remove internal dissension" (impliedly, at least, indicating some present intent by the parties to change the rights of each at least on management questions.) Further, the contract evidenced a full and complete agreement on the object (1000 shares) and the price ($40,000.00) notwithstanding that it was on credit terms. As the trial court found, the word "guarantee" as used in the agreement, along with several of the other provisions, indicated that a complete sale had been consummated and that Anderson only included the retention of title provision to insure payment, in other words as a security interest. To this end, and as a matter of security for Anderson, notwithstanding the express provision that Anderson was to "retain possession and title to said shares" Anderson was afforded an acceleration clause (on delinquency in the prescribed nine years of monthly payments, Anderson was given the election to demand that "... the entire unpaid purchase price of such shares of stock ... shall ... become and be immediately due and payable....") Additionally, he had the right, in the event of Ted, Sr.'s, default, to sell all or any part of the stock at public or private sale. The proceeds of the sale of "the collateral hereby pledged" (an indication that the stock was understood to be the debtor, Ted, Sr.'s) were to be used specifically for expenses of the sale, including attorney's fees, and payment in full of Ted, Sr.'s, obligation. Assuming availability thereof, the remaining balance was payable to Ted, Sr.
The agreement further provided that Ted, Sr., was in effect to be afforded the benefit of the stock's dividends on and after the date of the execution of the agreement *896 in 1939.[5] Finally, it was stated in the agreement that Anderson "may become the purchaser of such collateral hereby pledged at any sale so had," another indication that from the outset Ted, Sr., was being treated as the owner of the stock which was merely being pledged to Anderson as security.
La.Civ.Code art. 2456, relating to when a sale is perfected, provides:
The sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and for the price thereof, although the object has not yet been delivered, nor the price paid.
Under this provision a sale exists as between the parties when there is agreement as to object and price. The Court of Appeal relied on State ex rel Bulkley v. Whited & Wheless, 104 La. 125, 28 So. 922 (1900), in holding that the present agreement effected a completed sale in 1939 when the contract was executed. We think that reliance was well placed.
Bulkley involved a similar issue, a credit sale of corporate stock with no immediate delivery of the purchased shares to the vendee. Title was not to be transferred until final payment was made. The Court held that there was a completed sale when the instrument was executed, as there was agreement as to the thing and the price. While it is true that in Bulkley the shares were delivered to an escrow agent until final payment of the purchase price, and in the present case Anderson retained possession of the stock, we do not find that a truly distinguishing factor. Bulkley was founded upon the premise that there was agreement as to the thing and the price; delivery was not emphasized. This is, of course, consistent with La.Civ.Code art. 2456 which provides that a sale is complete when there is agreement as to the thing and the price "although the object has not yet been delivered, nor the price paid."
It is well settled that in interpreting contracts, "[w]hen there is anything doubtful in the agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms." La.Civ.Code art. 1950; Superior Oil Co. v. Cox, 307 So.2d 350 (La.1975); Crow Drilling & Producing Co. v. Hunt, 254 La. 662, 226 So.2d 487 (1969); and Jacka v. Ouachita Parish School Board, 249 La. 223, 186 So.2d 571 (1966).
In view of the above, we hold that the trial court and the Court of Appeal were correct in finding that the intent of the parties was to effect a sale of the stock, there being a present agreement as to the thing and the price, that Anderson was only retaining a security interest on the property, and the agreement was not merely "an agreement to sell." Furthermore, the substance of the agreement negates the contention that the agreement was a conditional sale with title to the property remaining in the seller until the whole price was paid.
Even if we were to assume, for purposes of argument, that the agreement was in fact a conditional sale, under Louisiana law it would nevertheless be treated as a credit sale in which ownership of the object of the sale passes at the time the contract is entered into. In re Wallace Lincoln-Mercury, Inc., 469 F.2d 396 (5th Cir. 1972); Roy O. Martin Lumber Co. v. Sinclair, 220 La. 226, 56 So.2d 240 (1951); Givens v. Southern *897 Farm Bureau Casualty Insurance Co., 197 So.2d 380 (La.App. 2d Cir. 1967), writs refused, 250 La. 902, 199 So.2d 916 (1967); Claude Neon Federal Co. v. Angell, 153 So. 581 (La.App. 2d Cir. 1934).
The law in this area was precisely and succinctly articulated in In re Wallace Lincoln-Mercury, Inc., supra, at 402:
[U]nder Louisiana law, a conditional sale whereby title is retained in the vendor is legally impossible, so the courts respect the contract but ignore the provision retaining title in the vendor. Morelock v. Morgan & Bird Gravel Co., 174 La. 658, 677, 141 So. 368, 374 (1932). By operation of the law of Louisiana title passes to the purchaser but the vendor retains the vendor's privilege provided by Louisiana Civil Code article 3227. Tangipahoa Bank & Trust Co. v. Kent, 5 Cir., 1934, 70 F.2d 139, 141; Christina Inv. Corp. v. Gulf Ice Co., 55 So.2d 685, 687 (1 Cir. La.App.1951).
Therefore, even if we were to find that the parties had attempted to contract a conditional sale, the retention of title provision would be disregarded and the contract would be interpreted as passing title to the vendee at the time the contract was entered, and the vendor would be held to have retained only a security interest in the property.
Appellants contend that a third party purchaser could have defeated Ted, Sr.'s, right to the stock by having Anderson endorse the shares over to the third party prior to the time they were endorsed to Ted, Sr., in 1943 and that, therefore, the sale was not final until that 1943 endorsement.
Under R.S. 12:601, appellants are correct in their assertion that a third party purchaser, obtaining an endorsement of the shares plus delivery, could have defeated Ted, Sr.'s, legal rights to the shares. However, as stated previously in our discussion of that statute, although compliance with the statute may protect a third party purchaser who deals with the record owner of the shares, it is not the exclusive means of transferring stock and would not negate the effects of an otherwise valid transfer between Anderson and Ted, Sr. As between those parties, there was an agreement as to the price and the thing, thereby effecting a present sale of the 1000 shares. The fact that a third party purchaser, obtaining an intervening endorsement of the shares, would be protected under R.S. 12:601 does not affect the rights or obligations of Anderson and Ted, Sr., as between themselves, nor does it mean that a valid transfer of ownership of the shares did not take place upon execution of the agreement.
For the foregoing reasons we conclude that the sale was perfected in 1939, upon execution of the contract and agreement between Anderson and Ted, Sr., as to the number of shares and the price. Therefore, the shares of stock obtained by Ted, Sr., in 1939, represented by Certificate Nos. 1 and 4, are Ted, Sr.'s, separate property and should be so listed in the descriptive list of the succession.

RIGHT TO SEEK DAMAGES AGAINST THE EXECUTRIX OF THE ESTATE
Katherine, as executrix, had petitioned the trial court for court approval of the sale, to Anderson-Dunham, of 394 shares of Ted, Sr.'s, stock to enable her to pay certain succession debts and expenses. Richard opposed the sale and sought an injunction. The trial court denied Richard injunctive relief and authorized the sale of the 394 shares of stock at the price of 105% of the book value under an April 1977 audit. Richard did not appeal suspensively and at the time his devolutive appeal was considered the sale had already taken place. Thus, the Court of Appeal held Richard's appeal was moot but reserved to him the right to try to annul the sale and/or seek damages from the executrix.
Thereupon, Richard, now joined by Ted, Jr., filed in the proceedings we now review an amended petition seeking to have the redemption annulled. Neither party sought damages. The trial court ruled that the redemption sale, even though to a corporation *898 which was largely owned by and being managed by the executrix of the estate, could not be annulled. The Court of Appeal affirmed that ruling but again reserved to Richard and Ted, Jr., the right to seek damages.
Richard and Ted, Jr., have not sought writs from this ruling, and, to the contrary, have in brief expressly acquiesced in it. Therefore, the only question presented to us is whether the Court of Appeal acted properly in reserving to appellees the right to seek damages from Katherine. Although appellant attempts to argue the merits of the issue before this Court, whether or not appellees can recover damages from her, that issue is simply not before us.
Richard and Ted, Jr., did not seek damages in their petition to the trial court and their right to recover damages is an issue which has not been raised. Rather, the Court of Appeal, while holding the sale could not be annulled, only reserved to Richard and Ted, Jr., the right to file a later suit for damages which they might claim they have suffered as a result of the redemption of the shares or other alleged mismanagement.
Therefore, the only issue before us is whether the Court of Appeal erred in reserving to appellees the right to file suit in the trial court for damages which they might have suffered as a result of Katherine's administration of their father's succession. Article 3191 of the Code of Civil Procedure sets out the general duties of the executor of a succession and provides in pertinent part as follows:
A succession representative is a fiduciary with respect to the succession, and shall have the duty of collecting, preserving, and managing the property of the succession in accordance with law. He shall act at all times as a prudent administrator, and shall be personally responsible for all damages resulting from his failure to so act.
This statute provides the remedy available to the heirs or legatees for the failure of the succession representative in carrying out his duty to administer the estate properly. That remedy is for the aggrieved heirs to petition for damages. In the present case damages have not yet been sought. Richard and Ted, Jr., were seeking an annulment of the sale. Upon denying the parties that relief, the Court of Appeal did not err in reserving to them the right to file suit against the executrix for damages for alleged breach of her administrative duties.

REMOVAL OF MRS. DUNHAM AS EXECUTRIX
Katherine O. Dunham was named executrix of Ted F. Dunham, Sr.'s, estate by Ted, Sr., in his will. Richard and Ted, Jr., have sought the removal of Katherine as executrix of the estate alleging that she has mismanaged the estate and breached her fiduciary duty to the heirs. The trial court, while finding that there certainly was a conflict of interest between Katherine and the two sons, did not find that she had breached her duties as executrix, and that the conflict of interest was not sufficient to require her removal. The Court of Appeal reversed this ruling by the trial court, holding that Katherine had in fact breached her fiduciary duty as executrix, and that removal was warranted. Katherine is seeking a review of that ruling.
As noted by both the trial court and Court of Appeal a mere conflict of interest between the succession representative and the heirs is not sufficient ground for removal of the succession representative. Succession of Kaffie, 273 So.2d 318 (La.App. 3d Cir. 1973), writs refused 276 So.2d 701 (La. 1973); and Succession of Favalora, 169 So.2d 197 (La.App. 4th Cir. 1964), writs refused 247 La. 355, 171 So.2d 476 (1965). For removal of the succession representative, the party seeking the removal must show more than a mere conflict of interest.
The grounds for removal of a succession representative are set out in C.Civ.P. art. 3182 as follow:
The court may remove any succession representative who is or has become disqualified, has become incapable of discharging *899 the duties of his office, has mismanaged the estate, has failed to perform any duty imposed by law or by order of court, .... (emphasis provided)
The duties of a succession representative are set out in C.Civ.P. art. 3191 as follow:
A succession representative is a fiduciary with respect to the succession, and shall have the duty of collecting, preserving, and managing the property of the succession in accordance with law. He shall act at all times as a prudent administrator, and shall be personally responsible for all damages resulting from his failure so to act.
Therefore, reading the two articles together it is clear that a succession representative cannot be removed because of a mere conflict of interest, but rather, it must be shown that he has mismanaged the estate or breached one or more of his required duties.
Appellees contend that Katherine, in addition to having a conflict of interest such that it affects her daily administration of the succession, has in fact mismanaged the succession and has breached her fiduciary duty to the heirs and legatees.
Appellees point to the comments to C.Civ.P. art. 3191 as providing the fiduciary standard referred to in the article. Comment (a) to C.Civ.P. art. 3191 provides in pertinent part:
This article is broad in scope and states the fiduciary relationship existing between the representative and the succession... should pervade all his operations and should not be restricted to his functions in relation to the collection, preservation, and management of assets only.
Appellees argue that Katherine breached her fiduciary duties when she sold 394 shares of Anderson-Dunham stock back to that corporation.
The corporation, of which Katherine was a director and officer, passed a resolution in 1973 providing that the corporation would redeem any stock of a deceased shareholder that his administrator might desire to sell. It further provided that the price should be no greater than 105% of the book value in the corporation's previous certified audit. In view of this resolution, Katherine as executrix wrote the corporation on May 3, 1977, attempting to sell 394 shares of Ted, Sr.'s, separately owned stock back to the corporation. While the corporation was by the 1973 corporate resolution authorized, or perhaps required, to purchase the stock of a deceased shareholder at the prescribed minimum and maximum determinable price it was nonetheless at liberty by appropriate resolution of its Board of Directors, and with the concurrence of the deceased shareholder's succession representative as to terms, to confect a new contract for acquisition of Ted, Sr.'s, stock. However, on May 4, 1977, the corporation adopted a resolution to redeem the shares at 105% of the book value from the April 1977 audit, or $1,519.15 per share. Katherine petitioned the court to have the sale authorized at this price. Richard attempted to enjoin the sale but on August 8, 1977, the trial court denied the injunction and authorized the sale.
As found by the Court of Appeal, Katherine did breach her fiduciary duty in permitting this stock redemption to take place at the above price. Katherine was very active in running the affairs of the corporation. She had knowledge of its affairs, its assets and its cash flow. There was evidence introduced that the corporation received over $500,000.00 in assets the day after the redemption took place, receipts which Katherine surely must have known were forthcoming. Yet she made no attempt to have these receipts or some of them included in an updated audit and the proper adjustment made to the value of the stock.
Likewise, the West Texas property, owned by Anderson-Dunham, Inc. was valued on the corporate books at only $1,392,000.00. Nonetheless, Katherine knew the property was worth at least $5,000,000.00 and had already advertised it for sale at over $5,000,000.00. Perhaps as a corporate officer there was nothing wrong with the low valuation of the Texas property on the corporate books, but as executrix of the *900 estate, in attempting to sell stock back to the corporation, she certainly should have insisted on a more updated valuation of the property since the sale price for the stock was in large measure being set according to the value of the corporate assets.
Furthermore, appellees have produced evidence indicating that at the time of the sale, the succession debts were not as high as she had earlier alleged in getting the court approval for the sale and that the money needed to pay the debts could have been obtained from other sources without the necessity of selling this stock, or at least not as much of it, stock in Anderson-Dunham being the succession's most valuable asset.
There was also admitted as evidence a board resolution which Katherine participated in having passed, in which it was provided that "it is disadvantageous to this corporation, as a creditor[6] of the decedent's succession, to have any of the assets delivered to any of the beneficial interest owners or legatees of the decedent." Participation in this type of corporate activity is directly at cross purposes with Katherine's fiduciary duty to the administration of the succession, as provided in C.Civ.P. art. 3197, "to close the succession as soon as advisable" and clearly reflects a breach of fiduciary duty to the succession.
In view of the above, we find that the Court of Appeal did not err in holding that Katherine had breached her fiduciary duty as executrix and in ordering her removed as executrix of the succession.

REMOVAL OF MRS. DUNHAM AND BILLY ALEXANDER AS TRUSTEES
Ted F. Dunham, Sr., created eight testamentary trusts. He provided that Katherine, Billy Alexander and Fidelity National Bank of Baton Rouge would be the co-trustees of these trusts. Fidelity declined acceptance of the trusts and Louisiana National Bank of Baton Rouge was appointed as replacement co-trustee. All the beneficiaries of the trusts have joined in the petition to have Katherine and Billy Alexander removed as trustees.
The trial court granted their request in part and ordered Katherine and Billy Alexander removed as trustees for the two trusts of which the sons, Ted, Jr., and Richard, were the beneficiaries. The Court of Appeal affirmed that ruling but amended it to provide that Katherine and Billy Alexander should also be removed as trustees to the six grandchildren's trusts also. We affirm that ruling.
As stated by the trial court there are only two cases in Louisiana dealing with the removal of trustees. Succession of Supple, 274 So.2d 790 (La.App. 4th Cir. 1973) and Holladay v. Fidelity National Bank, 312 So.2d 883 (La.App. 1st Cir. 1975). Both of these cases generally provided that mere animosity between the trustees and beneficiaries was insufficient ground for removal of the trustee.
However, while mere animosity is not sufficient ground for removal of the trustee, the statutory provisions relative to the responsibilities of a trustee are very rigid and hold the trustee to an even higher fiduciary responsibility to his beneficiary than that owed by a succession representative to heirs. The very word "trustee" implies the strongest obligation on the part of the trustee to be chaste in all dealings with the beneficiary.
Several provisions in the Trust Code indicate the high standard to which a trustee is held. R.S. 9:2082 provides that "a trustee shall administer the trust solely in the interest of the beneficiary." R.S. 9:2090 provides that "a trustee in administering a trust shall exercise such skill and care as a man of ordinary prudence would exercise in dealing with his own property." R.S. 9:2085 prohibits the trustee from buying or selling trust property directly or indirectly from or to himself, his relative, his employer, employee, partner or other business associate. R.S. 9:2091 provides that "a trustee is under a duty to a beneficiary to take *901 reasonable steps to take, keep control of, and preserve the trust property." These provisions of the Trust Code evidence the intention by the Legislature to place the very highest possible fiduciary responsibility on the trustee towards the beneficiaries.
Under R.S. 9:1789, "[a] trustee may be removed in accordance with the provisions of the trust instrument or by the proper court for sufficient cause shown." As held by the Court of Appeal, sufficient cause was shown here to require the removal of Katherine and Billy Alexander as trustees of all eight of the trusts.
As succinctly stated by the Court of Appeal:
It is shown that Mrs. Dunham and Mr. Alexander conveniently delayed their acceptances of the trusts for the two sons until such time as the stock redemption had taken place. The sale took place February 27, 1978, and the pleadings and briefs show that Mrs. Dunham and Mr. Alexander did not accept the trusts until shortly after the sale had taken place. It was their duty either to have recused themselves as trustees as it is obvious that they intended to accept the trusts as soon as the redemption had taken place, or to have accepted the trusts and actively opposed the sale in their capacities as trustees. They did neither. Rather than opposing the sale or recusing themselves, as would appear to have been the more proper course, they did nothing, thereby permitting the succession and the trusts to sustain a substantial injury. This was a breach of their fiduciary duties as trustees, having been both a breach of the duty to act prudently in selling investments (LSA-R.S. 9:2127), and their duty to administer the trust solely in the interest of the beneficiaries (LSA-R.S. 9:2082), as the sale benefited Mrs. Dunham as shareholder and strengthened Mr. Alexander's position as corporate president. Also, as trustees it was their duty to have caused the principal trust property, stock in Anderson-Dunham, to be productive of the income. Income from the stock to the trusts would necessarily have had to have been in the form of dividends distributed by Anderson-Dunham. Trustees are under a duty to take reasonable steps to obtain possession of legacies. Comment (c) under LSA-R.S. 9:2091. It was the trustees' duty to have exerted pressure by threatening to demand delivery of the legacy, viz, corporate stock in trust, thereby influencing the corporation to distribute dividends, or to demand delivery of the stock from Mrs. Dunham in her capacity as executrix, so that the trustees could vote the stock in such a manner that the corporation would declare dividends. They did neither. Thus, they again breached their fiduciary duty. We, therefore, hold that the trial court was correct in removing Mrs. Dunham and Mr. Alexander as trustees of the trusts for the two children. Likewise, we find that they should have been removed as trustees of the trusts for the six grandchildren. The same injury that occurred to the children also occurred to the grandchildren. The grandchildren also suffered from Mrs. Dunham's and Mr. Alexander's failure as trustees to oppose the sale of the stock as the stock redemption, or to recuse themselves. The grandchildren also suffered from the failure of the corporation to declare dividends. It is, therefore, apparent that Mrs. Dunham and Mr. Alexander should be removed as trustees of the grandchildren's trusts as well.

Decree
For the foregoing reasons, the judgment of the Court of Appeal is affirmed in part and reversed in part as follows:
The judgment of the Court of Appeal is reversed insofar as it found the 490 shares of stock in Anderson-Dunham, Inc., represented by Certificate No. 3, to be the separate property of Ted F. Dunham, Sr. The trial court judgment holding that these shares of stock are the separate property of Katherine O. Dunham is reinstated. We hold that the shares were properly omitted from the descriptive list and inventory of properties of the Ted F. Dunham, Sr., succession.
*902 The judgments of both the Court of Appeal and trial court are affirmed insofar as they held that the 1,000 shares of stock in Anderson-Dunham, Inc., represented by Certificate Nos. 1 and 4, are the separate property of Ted F. Dunham, Sr., and insofar as they ordered that the shares be included in the descriptive list and inventory of properties as the separate property of Ted F. Dunham, Sr., in the succession.
The judgment of the Court of Appeal is affirmed insofar as it ordered the trial court judgment amended so as to recognize and expressly reserve the right of Ted F. Dunham, Jr., and Richard E. Dunham to seek damages from Katherine O. Dunham, as executrix of the estate.
The judgment of the Court of Appeal is affirmed insofar as it reversed the trial court ruling which denied the petition to remove Katherine O. Dunham as executrix of the succession, and insofar as the Court of Appeal ordered her removed as executrix of the succession and remanded the case to the trial court for the appointment of a testamentary executor in accordance with law.
The judgments of both the Court of Appeal and the trial court are affirmed insofar as they ordered Katherine O. Dunham and Billy J. Alexander removed as trustees of the two testamentary trusts created by the deceased with Ted F. Dunham, Jr., and Richard E. Dunham as principal and income beneficiaries.
The judgment of the Court of Appeal is affirmed insofar as it reversed the trial court ruling denying the petition to remove Katherine O. Dunham and Billy J. Alexander as trustees for the six separate testamentary trusts created by the deceased for his grandchildren and ordered them removed.
AFFIRMED IN PART; REVERSED IN PART; REMANDED.
MARCUS, J., dissents and assigns reasons.
MARCUS, Justice (dissenting).
First, I consider that the 490 shares of Anderson-Dunham stock represented by Certificate No. 3 are the separate property of Ted F. Dunham, Sr. The stock certificate issued to Katherine O. Hall (later Mrs. Dunham) was endorsed over to Ted F. Dunham on the same day it was issued on the day following incorporation.
I do not consider that the majority has adequately considered the instrument characterized as a "conditional sale" of 1,000 shares of Anderson-Dunham stock represented by Certificate Nos. 1 and 4 under Oklahoma law. La.Civ.Code art. 10 provides that private written instruments are governed by the laws of the place where they are executed. The instrument in question between James L. Anderson and Ted F. Dunham was executed in Oklahoma on April 5, 1939. The instrument clearly provides that title and possession of the stock were to remain in the vendor until final payment was made. I am not convinced that under Oklahoma law the sale was not perfected in 1939, in which case the 1,000 shares of stock would be the separate property of Ted F. Dunham, Sr.
I also disagree with the majority that Mrs. Dunham should be removed as executrix of the estate of her late husband. I further disagree with the majority in removing Billy J. Alexander and Mrs. Dunham as trustees of the two testamentary trusts in which Ted F. Dunham, Jr. and Richard Dunham are beneficiaries and as trustees of the six testamentary trusts created by the deceased for his grandchildren.
Accordingly, I respectfully dissent.
NOTES
[1] The agreement states that Anderson owns 1010 shares of stock in Anderson-Dunham, Inc. represented by Certificate Nos. 1, 4 and 5 and that 1010 shares are what is being sold. There is some discrepancy in the number of shares Anderson actually owned and intended to sell to Ted, Sr. Certificate No. 1 was issued to Anderson for 500 shares. Certificate No. 4 was issued to Anderson for 500 shares. However, Certificate No. 5 was issued to Ted, Sr., for 500 shares, and there is no evidence that Anderson ever owned more than the 1000 shares represented by Certificate Nos. 1 and 4. No explanation has been given for this discrepency and it is not a matter which is now in dispute. Therefore, for the purpose of discussion of this issue, we will only concern ourselves with the 1000 shares represented by Certificate Nos. 1 and 4.
[2] Ted, Jr., and Richard contended that Dunham Land, Inc. was not a subsidiary of Anderson-Dunham but rather was owned by them, with their father, in the proportions listed in the text. The Court of Appeal ruled against Ted, Jr., and Richard on this issue and they have not sought writs from that ruling. Therefore, the holding by the Court of Appeal that Dunham Land, Inc. is a wholly owned subsidiary of Anderson-Dunham is final.
[3] 26 U.S.C. § 303 permits the sale of stock, if by way of a redemption, by a deceased shareholder's estate, to qualify for capital gains treatment, affording a tax savings to the estate, provided that such redemption takes place within four years of the shareholder's death.
[4] Perhaps the reason the parties have abandoned their argument that Oklahoma law is applicable here is because such an application would probably have no effect on the outcome as to this issue.

If we were to consider the contract under Oklahoma law, it appears that we would have to conclude that the agreement represents nothing more than an instant sale with a retained security right held by Anderson. Oklahoma jurisprudence supports appellees' argument that where an agreement provides that title is reserved in the seller-creditor until payment in full, but all other ownership rights are transferred to the debtor, then such agreements are treated as though title had been transferred to the debtor and the seller-creditor had retained only a security interest. O'Dell v. Kunkel's Inc., 581 P.2d 878 (Okl.1978). See also 12A O.S.1971, §§ 2-401(1), 9-101 et seq., 9-202 and the cases cited thereunder.
Furthermore, it is well settled that where the issue under consideration is the classification of movable property in terms of whether it is community or separate property of a married couple, we must look to the law of the parties' domicile at the time of the acquisition. Since at all times pertinent to this issue both parties were domiciled in Louisiana, and they married and lived in Louisiana throughout their lives together, it is Louisiana's law which would be controlling. Succession of Thomas, 35 La.Ann. 19 (1883); and Succession of Packwood, 12 Rob. 366 (1845); 18 La.L.Rev. 557 (1958); Restatement (Second) of Conflict of Laws § 258 (1969); H. Goodrich and E. Scoles, Conflict of Laws §§ 124 and 125 (4th ed. 1964).
[5] While the agreement does not state that the dividends were to be paid to Ted, Sr., the clear implication from the arrangement was that he was to get the benefit of dividend payments. The trial court explained:

As a final measure to guarantee payment of the balance of the indebtedness, paragraph # 12, provides that all of the dividends declared by Anderson-Dunham will be credited to the last payments due on the stock. Although it may be argued that the portion of the sentence "... all dividends received by the party of the first part (Anderson), by reason of ownership of the stock herein above described..." may indicate that ownership of the stock still remained in Anderson, a practical application of the provision indicates otherwise. Under that provision Dunham, not Anderson, is the actual recipient of the benefit from the dividends in that the dividend is credited to the amount owed by Dunham for the stock.
[6] Anderson-Dunham, Inc. was a creditor of the Dunham succession. Ted, Sr., had made loans from the corporation and so had Katherine as executrix of the estate.