CARAWAY, J.
1 ,This appeal concerns a declaratory judgment for the division of ownership of shares in a corporation that did not formally issue stock in the early days of its existence but continued to operate as a business for over 20 years. The dispute is between appellant, who was one of the original incorporators, and the legal heirs of his co-incorporator, who was also appellant’s father. The trial court found that at the time of the co-incorporator’s death, appellant owned 50% of the shares in the corporation and that the co-incorporator owned the other 50% of shares. Because the record supports that the incorporators each contributed adequate consideration to the corporation in its formative years and thereafter, we find that the trial court’s judgment was not clearly wrong, and thus, we affirm the judgment.

Facts and Procedural Background

The facts of this family dispute are described in detail in the previous appeal of this case found in Tedeton v. Tedeton, 46,-901 (La.App.2d Cir.02/08/12), 87 So.Sd 914 (“Tedeton /”). The record remains virtually the same following stipulations reached by the parties upon remand by this court. However, a brief summary of relevant facts will be repeated.
In this case, Byron Kirk Tedeton, Sr. (“Kirk”), seeks a declaratory judgment that he owns 100% of the shares in Tedco, Inc. (“Tedco”), a company that he and his father, Clayton Tedeton (“Clayton”), incorporated on March 15,1982. Tedco eventually sold soap products called Miracle II, the formula of which Clayton believes was revealed to him by God in 1981. Upon this revelation and for some time after Tedco’s incorporation, Clayton 12and his family, including Kirk, produced but did not sell the soap products. Clayton and Kirk were listed as the incorporators, registered agents, and initial directors of Tedco. The articles of incorporation or any other formative corporate documents did not identify the initial shareholders of the corporation. Clayton, for most of Tedco’s active years, promoted the soap products in what he and his family called his outreach ministry. Kirk and his wife, Sue Tedeton (“Sue”), managed during the active years of the business the day-to-day affairs of Tedco and manufactured the soap products. The earliest tax return for Tedco shown by the evidence was in 1993. In 1993-95, Kirk filed the tax returns for Tedco. On those tax forms, he indicated that no person owned more than 50% of Tedco.
In 2007, Clayton died, and this dispute over Tedco eventually arose between Kirk and the defendants, his mother, Patsy Te-deton (“Patsy”), and sisters, Deborah Davis and Pamela Savage (collectively, the “Defendants”).
After Clayton’s death, Patsy visited with an attorney concerning a possible succession of Clayton. She told the attorney that possibly Clayton’s only significant asset was his ownership interest in Tedco. Thereafter, the attorney contacted Kirk to obtain documents of corporate ownership so that he might confirm or dismiss any possible interest of Clayton in the company, including any stock certificates, Ted-co’s stock registry, and minutes of the board of directors authorizing the issuance of shares. In response, Kirk provided a *689 stock certificate stating that he was the owner of all 1,000 shares that Tedco was authorized to issue and minutes of shareholder meetings, all of which simply elect Kirk and Sue as President and Secretary-Treasurer, respectively, and state their duties.
| ¡¡To determine the issue of Tedco’s ownership, Kirk filed a petition for declaratory relief naming Defendants and requesting that Kirk be declared the owner of all shares in Tedco at the time of Clayton’s death. It was discovered during depositions that a stock certificate document and shareholder minutes had been prepared in 2005 at Kirk’s directive to prove corporate ownership in response to a Food and Drug Administration (“FDA”) investigation of Tedco at that time. Evidence was presented by both sides concerning the ownership of Kirk and Clayton. The Defendants presented evidence and argued that Clayton had owned all the shares since the corporation’s inception and, therefore, that Kirk owned zero shares at the time of Clayton’s death.
The trial court initially denied the relief Kirk requested but decreed that whatever ownership interest Clayton had in the Miracle II formula was community property and that it could not be transferred without Patsy’s concurrence. That judgment was appealed, and this court reversed and remanded the case after ruling that it was possible for Clayton to have transferred the Miracle II formula to Tedco without Patsy’s concurrence. See, Tedeton I. This court remanded the case for further consideration of whether the formula was transferred by Clayton to Tedco and whether Tedco was in fact a corporation or some other type of business entity, which would have a possible legal bearing on the ownership of Miracle II and Tedco.[1]
Upon remand, the parties presented no further evidence. Rather, the parties made several factual stipulations and submitted the case for decision. 14The parties stipulated (1) that Tedco is a validly formed Louisiana corporation and that its articles of incorporation were filed on March 11, 1982;[2] (2) that the articles of incorporation identified Clayton and Kirk as incorporators, registered agents, and the only directors; (3) that Tedco has maintained its corporate existence since its inception; and (4) that Clayton transferred any and all rights he owned in the original formula utilized in the production of Miracle II soap to Tedco.
After reconsidering the evidence and the stipulations, the trial court found that Kirk owned 50% of all issuable shares in Tedco, and that Clayton owned the other 50% of the shares at the time of his death. The court found that the testimony presented by both sides was largely self-serving and discounted it. The court also found that the post-dated stock certificate and the recreated minutes prepared in 2005 were a “sham” and determined that the stock certificate had no evidentiary value, or at best had no prima facie evidentiary value. The trial court concluded that the only reliable evidence of corporate ownership is the articles of incorporation listing Kirk and Clayton as the incorporators.
Kirk filed the instant appeal arguing that the trial court’s decision is clearly wrong in light of the documentary evidence, which included the stock certificate and tax returns stating that Kirk owned *690 100% of Tedco. Kirk contends íhat -the evidence clearly establishes that he is the sole owner of Tedco. Defendants answered the appeal arguing that the court’s decision was clearly wrong because the evidence shows that Kirk had no ownership | r,interest in Tedco and that Clayton always considered himself the owner. Therefore, they contend that Clayton was the 100% owner of Tedco when he died.
Discussion'
By the parties’ stipulations, two of the issues on remand noted in Tedeton I were made clear. One, Tedco was incorporated in 1982; two, Tedco became the business entity that acquired ownership of Miracle II and produced the eventual profits from the sales of that product. From those stipulations and all the facts surrounding Tedco and the sale of Miracle II over the years,- the trial court ruled that at the time of Clayton’s death in 2007, the shareholder ownership of Tedco was equally owned by Clayton and Kirk.
The trial court’s task was to declare the corporation’s ownership in a setting where stock certificate issuance was delayed at least 23 years from 1982 to 2005.[3] Kirk argues that the issuance of the stock certificate with all 1,000 shares of Tedco in his name evidences his ownership. However, the Defendants disputed the 2005 stock certificate as a sham.
The person, firm, or corporation, in whose name a certificate representing shares of stock stands, or to whom a certificate is endorsed, whether in full or in blank, and who has possession of said certificate, shall be regarded as the legal owner. La. R.S. 12:601. No person, corporation, | Bfirm, or transfer agent shall be responsible to any one claiming any interest in, or ownership of, said shares, or any part thereof, by virtue of any undisclosed or latent legal or conventional title or interest therein. Id.
However, in Tedeton I, we recognized that a stock certificate is not conclusive evidence of corporate ownership. We stated:
Although a stock certificate is prima facie evidence of corporate ownership, it is to be distinguished from actual ownership which may be determined from all the facts and circumstances of a case.
Tedeton I, supra at 924, quoting Fireplace Shop, Inc. v. Fireplace Shop of Lafayette, Inc., 400 So.2d 702, 703 (La.1981). The purpose of La. R.S. 12:601 is merely to provide protection for third persons who deal with the record owners of the stock. Succession of Dunham, 408 So.2d 888 (La. 1981); see also La. R.S. 12:57(A) (“[T]he rights and obligations of shareholders are not affected regardless of whether the shares are represented by certificates of stock”). In other words, as recognized by the jurisprudence, the absence of the proper issuance of stock certificates allows the court to make a determination of the ownership between shareholders of a closely held corporation from a totality of the circumstances.
Nevertheless, a trial court’s determination of corporate ownership is guided by the principles of Louisiana corporation law, *691 La. R.S. 12:1, et seq. Section 52 of the Louisiana corporation law is entitled “Issuance of shares; consideration.” La. R.S. 12:52. Relevant to this dispute, Section 52 provides that (1) the consideration for no-par value shares of the corporation may be initially fixed by the incorporators, see La. R.S. 12:52(A); (2) the consideration for issued shares may be paid in corporeal or incorporeal |7property or services actually rendered to the corporation, see La. R.S. 12:52(C); and (3) the directors’ valuation placed upon the consideration for shares, other than cash consideration, shall be conclusive, see La. R.S. 12:52(D).[4]
The standard of review in this case is the manifest error/clearly wrong standard. In order to reverse a factfin-der’s determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding and (2) further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous.. The appellate court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently. Bailey v. Donley, 44,919 (La.App.2d Cir.12/09/09), 26 So.3d 987, citing Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217 (La.4/03/02), 816 So.2d 270. Because the ownership of the corporation is determined based on the facts and circumstances of the case, the trial court’s findings of corporate ownership may be reversed only upon a showing of manifest error.
The trial court placed emphasis on the fact that both Clayton and Kirk were listed as incorporators in 1982. They were also listed as directors in the corporation’s initial report. While there was no formal fixing of the value of the corporate shares or the issuance of stock certificates at the time, the trial court could consider the evidence of the contributions into the corporation at the inception of the corporate business activity. That evidence, circumstantial and otherwise, reveals that both Clayton and Kirk contributed in the commencement of the affairs of the business enterprise.
*692 La. R.S. 12:52 provides that “incorporeal property” may serve as consideration for shares in corporations. La. R.S. 12:52(C). As we noted in Tedeton I, supra at 921, the formula for Miracle II is an incorporeal movable. See La. C.C. art. 478. The parties stipulated that Clayton transferred any and all his interest in the formula to Tedco. Therefore, it was reasonable for the trial court to conclude this transfer to Tedco was made in exchange for an ownership stake in the corporation that was created to sell Miracle II products. Therefore, Clayton contributed adequate consideration in exchange for shares in Tedco. He also received financial benefits from Tedco from the sale of the Miracle II product through the years. The trial court was not clearly wrong in determining that Clayton owned a portion of the corporation from the beginning of the business.
Whether Kirk provided adequate consideration in exchange for shares in Tedco may be less apparent, but nevertheless, the record supports the trial 19court’s factual finding that Kirk contributed initial consideration for shares. Both Kirk and his wife, Sue, testified that they worked in the preparation of the Miracle II product in the early 1980s. Yet, during that time, the business of the corporation was not clear. However, one reasonable view of the business presented in the testimony was that beginning in 1988 and thereafter, the commercial manufacturing of Miracle II by Tedco for profit began in earnest. At that time, Clayton had lost everything from the financial difficulties of his prior businesses. He separated from his wife and began to reside on Kirk’s property in a building that began to serve as Tedco’s office and place of manufacture of the product. When Tedco’s corporate business is viewed as having commenced at that time, Kirk’s contribution of the facility for manufacturing and his commitment[5] to *693 the | ^management of the operations of the manufacturing process may also represent an adequate consideration for an ownership position in the corporation.
We therefore find that the trial court’s determination of the father’s and son’s corporate ownership of Tedco is based upon a reasonable view of the evidence and not clearly wrong. That ruling likewise does not violate the principles of Section 52 of the Louisiana corporation law. Clayton and Kirk as incorporators can be viewed from the circumstantial evidence of their relationship as having fixed the value of the consideration of the shares in Tedco and as having paid in that value capitalizing Tedco with corporeal and incorporeal properties they committed to the corporation. In a closely held corporation with complete acquiescence to informal management of the corporation between the shareholders, we find that a determination of equal ownership under the facts of this case is not manifestly erroneous.
By the appeal and answer to the appeal, both sides dispute the trial court’s ruling, asserting that the corporation was either 100% in Clayton or Kirk and not the equal sharing of ownership found by the trial court. The parties cite key third-party testimonial evidence, which they assert as conflicting with the trial court’s ruling. These views are revealed by two lawyers who were involved with Tedco on separate occasions.
The Defendants presented the testimony of Orlando Easterling, the attorney who prepared the corporate documents for the 1982 filing with the Secretary of State. Easterling testified that it was his impression that | n Clayton would be the owner of Tedco. Clayton directed Easterling’s actions. Nevertheless, Easterling admitted that Kirk “must have been there” in the process. Easterling also remembered that Clayton wanted to form a corporation because he wanted to be able to easily divide the ownership of the corporation. Easter-ling’s documentation, itself, listing Kirk as a director in the initial report before any vote of the “shareholders,” gives an implication that Kirk may have been intended to be a shareholder. Cf. La. R.S. 12:81. Easterling obviously did not direct Clayton regarding the importance of the issuance of shares and the maintenance of a stock registry.
Taken as a whole, therefore, Easter-ling’s testimony did not report that Clayton told him directly to ensure that there be a corporate issuance of all shares solely to Clayton or Clayton and Patsy Tedeton, without Kirk owning an interest in the corporation. Accordingly, the trial court’s factual determination of the corporate ownership from the evidence of both men’s contributions for beginning the commercial business of Tedco is not contradicted nor shown to be clearly wrong because of Easterling’s testimony.
Turning to Kirk’s assertion of 100% ownership, it must first be observed that the trial court’s reasonable determination that Clayton owned part of the corporation from inception means that Kirk was required to show a transfer of Clayton’s shareholdings to him before Clayton’s death. There is no evidence that Clayton ever executed a transfer of his ownership in Tedco. Kirk could show no stock certificate delivery from Clayton, and no written *694 act of transfer, onerous or gratuitous, occurred.
| ^Nevertheless, Kirk maintains that the documentary evidence, particularly the issuance of the stock certifícate, clearly shows that he owned all the shares of Tedco. On its face, the stock certifícate is signed by Kirk, as president, and Sue, as secretary, and contains an unclear date which became a focus of the testimony. A Tedco lawyer, Steven Dean, admitted preparing the certificate in 2005 in response to the FDA investigation. The stock certificate indicates, with italics in the original, that it was “[d ]ated this 15th day of March 20 1982.” The stock certificate form was apparently to allow for a year after 2000 to be inserted. Additionally, Kirk and Sue were not corporate officers of Tedco in March 1982, making the certificate suspect on its face.
Steven Dean, who by 2007 was employed directly by Tedco, testified concerning the backdating of the stock certificate in 2005 and Clayton’s knowledge of the action. Kirk argues that this testimony established that Clayton concurred with the issuance of all shares to Kirk in 2005. Dean’s testimony regarding this was as follows:
Q: In your opinion did Mr. Clayton know that you had prepared a stock certificate and you had prepared these minutes to be furnished to the FDA?
A: Yes, he did.
Q: Did he ever object or make any statement that Kirk was not the hundred percent owner of Tedco?
A: He did not.
The Defendants challenged Dean’s credibility and the explanation of the issuance of the stock certificate in connection with the 2005 FDA investigation. Kirk and Dean testified that the stock certificate and | ^shareholder minutes were first prepared in 2005 with copies sent to a Washington, D.C., law firm representing Tedco. Nevertheless, the Defendants’ discovery inquiries to the Washington, D.C., firm indicated that no such internal corporate records of Tedco had been supplied to the firm.
Gary Graham, the attorney representing Patsy for the succession proceedings for Clayton, also challenged Dean’s credibility. Graham requested Tedco’s stock registry on August 6, 2007. Dean provided Graham the stock certificate and other corporate documents on August 10 in a meeting. After reviewing the certificate, Graham wrote Dean on August 27 stating that the date on the certificate was “somewhat confusing,” but that he was “going to assume it was issued on March 15, 1982.” Dean responded by letter on August 30 as follows:
The stock certificate issued to Kirk, a copy of which you included with your latest letter, contains an obvious error, that being the number “20” that was inadvertently typed into the date line, which should correctly read “Dated this 15th day of March, 1982.” This date is the date of filing of evidence of organization of Tedco, Inc. with the Louisiana Secretary of State.
The Defendants and Graham challenged Dean’s account of the issuance of the stock certificate as misleading, at best, or false because the certificate is dated in 1982 and the correspondence does not mention Dean’s purported preparation of the certificate in 2005. Dean insisted that Graham was told before August 27 of the 2005 “issuance” of the stock with the backdate of 1982. Graham denied that he was told by Dean in August 2007 of the 2005 events.
Given this conflicting testimony and this “recreation” of historic corporate events, we cannot conclude that the trial *695 court erred in discounting 114Pean’s testimony and ruling that all the corporate records created by Dean after the fact at Kirk’s directions were a “sham.” This was a credibility evaluation reserved to the fact finder. We therefore cannot conclude that the trial court was clearly wrong in its factual finding that the 2005 stock certificate was not an appropriate action reflecting Clayton’s intent as an owner of Tedco at that time.

Conclusion

From this review of the record, we find that both Clayton and Kirk provided adequate consideration for shares in Tedco and that the trial court’s determination of their proportional interest was not manifestly erroneous. Clayton never transferred his shares to Kirk Tedeton. Therefore, we affirm the trial court’s judgment that at the time of Clayton Tedeton’s death, Kirk Tedeton owned 50% of the shares in Tedco and Clayton Tedeton owned the other 50%. Costs of this appeal are assessed equally to the parties.
AFFIRMED.

. The court in Tedeton I also ordered the joinder of the Succession of Clayton Tedeton, which is now included as a party.

. The parties’ joint stipulation states that the árticles of incorporation were filed on the 11th, but the actual certificate of incorporation states they were filed on March 15, 1982.

. The evidence in the record also suggests that the stock certificate and minutes may have been prepared in response to this litigation rather than for the FDA investigation in 2005. The Defendants’ attorney sought the documents of corporate ownership submitted to a Washington, D.C., law firm representing Tedco in the FDA investigation. The firm had no records of the stock certificate or minutes, or any other documents of corporate ownership. The D.C. firm only had public records kept by the Louisiana Secretary of State. Nevertheless, Kirk insisted the stock certificate and minutes were delivered to the D.C. firm.

. Louisiana Revised Statutes 12:52 states, in pertinent part:
A. Par value shares may be issued initially for such consideration expressed in dollars, not less than the par value thereof, as shall be fixed by the board of directors. Shares without par value may be issued from time to time for such consideration expressed in dollars as may be fixed by the board of directors or by the shareholders by a vote of a majority of the voting power present, if the articles reserve to the shareholders the right to fix the consideration; provided however, the consideration for such shares may be initially fixed by the incorporators. Treasury shares may be disposed of by the corporation for such consideration as may be fixed from time to time by the board of directors. All fully paid shares shall be nonassessable.
C. The consideration for shares issued otherwise than as stated in subsection B of this
section, shall be paid in cash or in corporeal or incorporeal property, or services actually rendered to the corporation, the fair value of which is not less than the dollar amount of the consideration fixed for the shares, before the shares are issued. Upon payment of the consideration fixed therefor, such shares shall be considered as fully paid. Cash consideration for shares may not be paid by the purchaser’s note, secured or unsecured, or uncertified check; and in case of delivery of such a note or check in payment for shares, the shares shall not be issued until the note or check has been paid in full.
D. Solely for the purpose of determining whether shares have been paid for fully, the valuation placed by the shareholders or the directors, as the case may be, upon the consideration other than cash paid therefor shall be conclusive.

. We view Kirk’s commitment in 1988 to make Tedco a success as a contract for services and an incorporeal that may be transferred to the corporation in exchange for shares. A person may contribute incorporeal property to a corporation in exchange for shares. La. R.S. 12:52(C). Rights, obligations, and actions that apply to a movable thing are incorporeal movables. La. C.C. art. 473. When a person pledges his services to a corporation in exchange for shares, he is obligating himself to perform — specifically, to do something for the corporation. See also Glenn G. Morris & Wendell H. Holmes, Business Organizations § 10. 06, in 7 La. Civ. L. Treatise (2013 ed.).
However, we also recognize that La. R.S. 12:52(C) provides that a corporation may issue shares for “services actually rendered to the corporation.” Some Louisiana appellate courts have interpreted the language in La. R.S. 12:52(C) referring to services "actually rendered” to exclude promises to provide future services to the corporation. See Prejean v. Commonwealth for Cmty. Change, Inc., 503 So.2d 661 (La.App. 3d Cir.1987); Lothrop v. Goudeau, 142 La. 342, 76 So. 794 (1917); see also 7 La. Civ. L. Treatise, Business Organizations § 10. 06 (2013 ed.). Nevertheless, subsequent cases examining this rule hold that although a person had not already performed actual services, the subsequent rendering of those services validated the issuance of the shares. See Hotard v. Diabetes Self Management Center, Inc., 02-944 (La.App.3d Cir.02/05/03), 838 So.2d 94 (validating the issuance of shares for promise to perform managerial services in dispute over election of directors on the basis that La. R.S. 12:52(C) states that ”[u]pon payment of the consideration fixed therefore, such shares shall be considered fully paid”); see also Kibodeaux v. Harrison, 93-1361 (La.App.3d Cir.05/04/94), 640 So.2d 503 (where the court did not find "clearly wrong (or inequitable) the trial judge’s conclusion that [the shareholder] not only provided services but guaranteed a legion of the [corporation’s] obligations and provided a host of support services in exchange for a half interest in the [corporation].” Kibodeaux, 640 So.2d at 506). Further, the requirement that services actually be rendered, rather than promised, is not found for the capitalization of limited liability companies. La. R.S. 12:1321. *693 Therefore, Kirk’s promise to make Tedco a successful business along with his contribution of his house as a manufacturing and office building may act as consideration for an ownership interest in Tedco. No dilution of the existing corporate ownership occurred, as Kirk’s and Clayton’s contributions to Tedco occurred together at the initiation of the commercial venture.