Judgment rendered December 14, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,828-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

SUCCESSION OF
RONNIE MACK GOODMAN

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 612671

Honorable Michael A. Pitman, Judge

* * * * *

| | |
|---|---|
| AYRES, SHELTON, WILLIAMS, BENSON & PAINE, LLC By: Curtis R. Shelton | Counsel for Appellant, Cory Goodman in his Capacity as Independent Executor of the Succession of Ronnie Mack Goodman, and in His Individual Capacity as Legatee |
| WEEMS, SCHIMPF, HAINES, SHEMWELL & MOORE, APLC By: Kenneth P. Haines | Counsel for Appellee, Wanda Goodman |
| LUNN, IRION LAW FIRM, LLC By: Alexander J. Mijalis | Counsel for Appellee, AEON Process Equipment & Control Solutions, Inc. |

* * * * *

Before MOORE, STEPHENS, and ROBINSON, JJ.

**STEPHENS, J.**

The issue in this appeal, which came before the trial court as a request for a declaratory judgment in the Succession of Ronnie Mack Goodman, is the classification and ownership of 823 shares of stock in Aeon PEC, a closely held corporation, issued in the name of Ronnie Mack Goodman. The trial court made a threshold determination that all of the stock in Aeon PEC held in Ronnie's name was community property.[1]

Appellant, Cory Goodman, the executor of his father Ronnie's succession (hereinafter "Cory/Executor"), contends that the trial court erred in finding that the evidence established that, prior to his death, the decedent, Ronnie Mack Goodman (hereinafter "the decedent" or "Ronnie"), made a valid donation of his community portion of 500 shares of Aeon PEC stock (evidenced by Certificate No. 1025) to his wife, Wanda Goodman, which transformed those shares into her separate property. Appellee, Wanda Goodman ("Wanda"), argues that the trial court correctly found that the decedent donated the stock to her separate estate by transferring them to her name.

For the reasons set forth below, we reverse and render in part, amend in part, and remand for further proceedings.

## FACTS/PROCEDURAL BACKGROUND

Halgo, Incorporated ("Halgo Delaware") was originally formed as a Delaware corporation on May 5, 1975. It was owned by business partners

---

[1] Neither party disputes this determination.

Ronnie Goodman and George Guillot ("George"). Halgo Delaware became a Texas corporation referred to as Halgo Texas on August 27, 2007.[2]

Ronnie and Wanda were married on September 5, 1998. They entered into a prenuptial agreement on September 2, 1998, in which they maintained some property as separate, and otherwise opted to subject themselves to Louisiana's community property regime. The marriage terminated upon Ronnie's death. Prior to his marriage to Wanda, Ronnie had been married to Janice B. Goodman. On July 8, 1996, their community of acquets and gains was partitioned. Pursuant to this partition, Ronnie retained separate ownership of the 400 shares in Halgo Delaware.

Ronnie and George decided to break up different components of the Halgo business into separate business entities, so they formed two new companies in 2008—Halgo PEC, which would be controlled exclusively by Ronnie, and Halgo Power, which would be controlled by George. This was accomplished by a reverse merger in accordance with Texas law in August 2008.

George owned a larger percentage of Texas Halco, and the aspect of the business that Halco PEC was to acquire—property and equipment necessary to own and operate a fire steam generating equipment business— was worth more than that of the business that Halgo Power was to acquire— property and equipment necessary to own and operate an industrial equipment and heat transfer business. Basically, Ronnie paid George $1.2

---

[2] Ronnie acquired his stock in Halgo Delaware prior to his marriage to Wanda. The Halgo Delaware stock was traded for Halgo Texas stock in the merger accomplished in August 2007. Wanda has never disputed that Ronnie's stock in Halgo Delaware and then Halgo Texas was his separate property.

million[3] to acquire its book of business from Halgo Texas and equalize the books between Halgo PEC and Halgo Power. Halgo Texas continued its existence after this reverse merger. The result of these transactions was that, as of August 25, 2008, Ronnie wholly owned Halgo PEC and kept 40 shares in Halgo Texas,[4] and George wholly owned Halgo Power and kept 60 shares in Halgo Texas.

Halgo PEC changed its name to Aeon Process Equipment & Control Solutions, Inc. ("Aeon PEC") on August 12, 2010. The 100 shares in Aeon PEC in Ronnie's name were split into 1,000 shares of Aeon PEC issued in his name on November 1, 2012. Over a period of time, Ronnie sold 177 shares in Aeon PEC to various Aeon PEC employees.

The record contains **Aeon PEC Stock Certificate No. 1025** dated January 10, 2016, which shows **500 shares in Wanda's name,** and **Aeon PEC Stock Certificate No. 1026** dated January10, 2016, which shows **323 shares in Ronnie's name**. These stock certificates were signed by Ronnie as President and Wanda as Treasurer.[5]

---

[3] The parties (Cory/Executor and Wanda) agree that the money used to buy out George was community property.

[4] Wanda has not contested that Ronnie's stock in Halgo Texas is his separate property. She points out that Ronnie's estate has a claim to the 40 shares of Halgo Texas that belong to Ronnie.

[5] Section 6.03 of Aeon PEC's Bylaws provides:

> Shares of stock shall be transferrable only on the share transfer records of the Corporation by the holder thereof in person, or by his duly authorized attorney. This is accomplished by surrender of the shares to the Corporation or the transfer agent of the Corporation duly endorsed. It is the duty of the Corporation or the transfer agent to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

On March 31, 2016, Ronnie executed a last will and testament. Ronnie died on October 29, 2018, and his will was probated on November 13, 2018. On June 20, 2019, Cory/Executor filed a petition for declaratory judgment seeking that the court determine the number of shares of Aeon PEC stock owned by Ronnie at his death. Cory's primary argument was that Ronnie acquired his Aeon PEC stock with separate property and that all but 20 shares of the stock belonged to Ronnie. Wanda filed an answer to the petition on July 26, 2019.

Thereafter, Cory/Executor filed a petition for writs of *quo warranto* and mandamus on February 4, 2021, naming Wanda and Aeon PEC as defendants. Cory/Executor filed an amended and restated petition for declaratory judgment the same day. Aeon PEC filed an answer to both pleadings on February 26, 2021, indicating its awareness of the dispute regarding ownership of the 823 shares of stock in the company and noting that the company's records show that 500 shares were issued in Wanda's name and 323 shares were issued in Ronnie's name.

Wanda filed an answer to Cory/Executor's later pleadings on March 15, 2021. In her answer, Wanda asserted that the 500 shares of Aeon PEC stock issued in her name were her separate property. She further claimed that the 323 shares issued in Ronnie's name were community property, and she owned one-half of them.

The matter was set for trial on August 10, 2021. However, at the parties' request, the trial court agreed to decide the case on the briefs. The matter was taken up by the trial court for consideration on the parties' stipulation of facts and exhibits submitted. Additional briefing was requested to address several questions from the trial court, one being

4

whether Ronnie had the intent to donate the 500 shares to Wanda. The parties submitted the requested post-trial memorandum addressing the trial court's concerns. A written opinion that included the trial court's written reasons for ruling was issued on November 15, 2021, and the trial court's judgment was signed on February 23, 2022. It is from this judgment that Cory/Executor has appealed.

## DISCUSSION

### *Applicable Legal Principles*

As noted above, there was no testimony at trial; all facts were presented to the court via written stipulations and documentary evidence in the form of exhibits. Although the determination of whether a donation took place is a legal question, the supporting evidence is based on factual conclusions drawn by the trial court. *Terrell v. Terrell*, 26,863 (La. App. 2 Cir. 5/10/95), 655 So. 2d 600; *Rivoire v. Maturin*, 02-0059 (La. App. 3 Cir. 5/8/02), 816 So. 2d 987. It is well settled that a court of appeal may not set aside a trial court's findings of fact in the absence of manifest error or unless they are clearly wrong. *Rosell v. ESCO*, 549 So. 2d 840 (La. 1989).

A donation inter vivos is a contract by which the donor divests himself, ***at present and irrevocably***, of a thing in favor of the donee, who accepts it. La. C.C. art. 1468 (emphasis added); *Malone v. Malone*, 46,615 (La. App. 2 Cir. 11/2/11), 77 So. 3d 1040; *Thomson v. Thomson*, 34,353 (La. App. 2 Cir. 1/24/01), 778 So. 2d 736. La. C.C. art. 1541 provides that a donation inter vivos shall be made by authentic act, unless otherwise expressly permitted by law. *Malone, supra*; *Thomson, supra*.

La. C.C. art. 473 provides that shares of stock are incorporeal movables. Although stock is not subject to manual donation as established

5

by La. C.C. art. 1543 (former art. 1539), the Uniform Stock Transfer Act (and subsequently Chapter 8 of Title 10 of the Louisiana Revised Statutes)[6] establishes a means of transferring stock that supplements the requirement that donations *inter vivos* be made by authentic act. La. C.C. art. 1550, as amended by Acts 2008, No. 204, §1, eff. Jan 1, 2009, provides:

> ***The donation or the acceptance of a donation of an incorporeal movable of the kind that is evidenced by a certificate, document, instrument, or other writing, and that is transferable by endorsement or delivery, may be made by authentic act or by compliance with the requirements otherwise applicable to the transfer of that particular kind of incorporeal movable***.
>
> In addition, ***an incorporeal movable that is investment property***, as that term is defined in Chapter 9 of the Louisiana Commercial Laws, ***may also be donated by a writing signed by the donor that evidences donative intent and directs the transfer of the property to the donee*** or his account or for his benefit. Completion of the transfer to the donee or his account or for his benefit shall constitute acceptance of the donation. (emphasis added).

The Revision Comments—2008, comment (c), to article 1550 explains, that ***at all times, donative intent is required***.

Shares of stock are investment property. *Malone*, *supra*. La. R.S. 10:9-102(a)(49) defines "investment property" as a security, whether certificated or uncertificated, security entitlement, securities account, commodity contract, or commodity account. La. R.S. 10:8-103(a) provides that a share or similar equity interest issued by a corporation, business trust, joint stock company, or similar entity, is a security. U.C.C. Comment 2 to

---

[6] Chapter 8 of Title 10 replaced the Uniform Stock Transfer Act, La. R.S. §§12:621-12:643 (1950), repealed by Act approved June 29, 1978, No. 165, §6, Acts 1978, Nos. 476, 498. The transfer of title of shares and certificates was governed by La. R.S. §§10:8-308-10:8-309, which were vacated and reenacted by Acts 1995, No. 884, §1, effective Jan. 1, 1996. The law as to transfer of stocks is now found in La. R.S. §§10:8-301–10:8-307, "Transfer of Certificated and Uncertificated Securities." Kathryn Venturatos Lorio, *Successions and Donations*, §8.4, at 238, fn. 4, in 10 *Louisiana Civil Law Treatise* (2d ed. 2009).

La. R.S. 10:8-103(a) notes, "Subsection (a) establishes an unconditional rule that ordinary corporate stock is a security. That is so whether or not the particular issue is dealt in or traded on securities exchanges or in securities markets. Thus, shares of closely held corporations are Article 8 securities."

Regarding donative intent and the Civil Code's substantive requirements for a donation, in *Broussard v. Broussard*, 340 So. 2d 1309, 1313 (La. 1976), the Louisiana Supreme Court held, "[E]ven in a case where compliance with the stock transfer legislation may substitute for the codal formalities of a donation, the substantive requirements of a divestment and donative intent must be fulfilled in order to effect a valid donation." *See also, Succession of Dunham*, 408 So. 2d 888 (La. 1981); *Champagne v. Champagne*, 07-1078 (La. App. 1 Cir. 6/27/08), 992 So. 2d 1072; *Blue v. Coastal Club, Inc.*, 524 So. 2d 883 (La. App. 3 Cir. 1988), *writ denied*, 525 So. 2d 1044 (La. 1988).

Notwithstanding any other form requirements for a valid donation *inter vivos*, "the substantive requirements of divestment and donative intent must be established." *Succession of Dauterive*, 18-0131, p. 5 (La. App. 4 Cir. 7/18/18), 251 So. 3d 1204, 1208, *writ denied*, 18-1382 (La. 11/14/18), 256 So. 3d 293, citing *Succession of Woolfolk*, 225 La. 1, 71 So. 2d 861, 864 (1954). In order to show that a ***manual gift*** was made, there must exist strong and convincing proof that the donor had the intent to irrevocably divest himself of a thing and that delivery was made. *Cimino v. Capps*, 48,122 (La. App. 2 Cir. 6/26/13), 117 So. 3d 573; *Crawford v. Reagan*, 34,417 (La. App. 2 Cir. 2/28/01), 779 So. 2d 1116; *Terrell*, *supra*. The donee has the burden of proving donative intent, which is a factual issue. *Cimino*, *supra*; *Terrell*, *supra*. The burden of proof to support the donation

7

must be strong and convincing. *Succession of Woolfolk, supra*; *In re Succession of Jones*, 43,365 (La. App. 2 Cir 6/4/08), 986 So. 2d 809, *writ denied*, 08-2023 (La. 12/12/08), 996 So. 2d 1117.

Important in proving a **manual donation** are the donor's outward acts, together with any admissible evidence of the relationship of the parties. *Cimino*, *supra*; *Redmon v. Lindsey*, 18-51 (La. App. 3 Cir. 6/6/18), 2018 WL 2731891 (unpublished).

### *Cory/Executor's Argument*

Cory/Executor asserts that the trial court's determination that Ronnie donated the 500 shares evidenced by Certificate No. 1025 to Wanda is legally erroneous because there was no donation by authentic act as provided for in the first paragraph of La. C.C. art. 1550,[7] and there was no evidence of a writing signed by Ronnie evidencing donative intent and directing the transfer of the property to Wanda as required by the second paragraph of La. C.C. art. 1550. Because the stock is investment property, it is specifically governed by the second paragraph of La. C.C. art. 1550. However, emphasizes Cory/Executor, Wanda did not make a case for a valid donation thereunder, and the trial court erred in finding otherwise.

Cory/Executor urges that there is "utterly" no evidence of donative intent on the part of Ronnie since there was/is: no assignment from Ronnie to Wanda; no act of donation from Ronnie to Wanda; and, no evidence that Wanda used separate funds/property to acquire any of Ronnie's separate

---

[7] There also could have been a valid donation of the stock under the first paragraph of La. C.C. art. 1550 had Ronnie not just complied "with the requirements otherwise applicable to the transfer of that particular kind of incorporeal movable" but also **fulfilled the substantive requirements to effect a valid donation** as well. *See*, *Broussard*, *supra*; *Blue*, *supra*; *Feldheim v. Plaquemines Oil & Development Co.*, 263 So. 2d 382 (La. App. 4 Cir. 1972).

property shares or the community property shares as her separate property. Instead, what the trial court relied upon to find this elusive intent to donate was: (1) the Aeon PEC Certificate No. 1025 issued in Wanda's name; (2) the "fact" that "Mr. Goodman voided Certificate No. 1023, issued Certificate No. 1025 showing five hundred (500) shares in Wanda's name, and recorded the transaction on the company's books"; (3) the marital relationship between Ronnie and Wanda; (4) "Wanda Goodman's degree of involvement in the corporate affairs of Aeon PEC"; and (5) Ronnie's last will and testament. Cory/Executor then goes through each one to stress the record's lack of support for the findings, particularly in light of the fact that there was no testimony, either live or via deposition, to support any of these determinations.

Cory/Executor urges this Court to find that his father Ronnie did not have donative intent and instead, left his community interest in all 823 shares of stock to Cory as provided in Ronnie's last will and testament (although this Court does not need to specifically find that—the only issue actually to be decided is whether the trial court erred in determining that the donation was valid and the 500 shares of stock are Wanda's separate property).

*Wanda's Argument*

Wanda contends that the trial court did not err in concluding that there was a valid donation of the stock by Ronnie to her, or in finding that Ronnie had donative intent. Wanda points this Court to La. R.S. 12:601, which provides in part that the person in whose name a certificate representing shares of stock stands and who has possession of said certificate, shall be regarded as the legal owner. She also asserts that the existence of donative

intent is an issue of fact, and the record fully supports the trial court's finding in this case. This finding by the trial court cannot be overturned absent a finding of manifest error, which is not present, urges Wanda.

According to Wanda, she became the owner of the 500 shares of stock given to her by Ronnie upon signature and recordation of the transaction on the company's books. Gifts made by one spouse to the other during the existence of the community property regime become the separate property of the donee spouse pursuant to La. C.C. art. 2343. Next, as set forth in *Primeaux v. Libersat*, 322 So. 2d 147 (La. 1975), and La. C.C. art. 1550, this was done in accordance with the applicable Aeon PEC bylaw. *See*, Bylaws, Aeon PEC, §6.03.

Wanda contends that the formalities of La. C.C. art. 1536 are unnecessary if stock shares are validly transferred pursuant to Louisiana stock transfer legislation, citing *Primeaux*, *supra*; and *Champagne*, *supra*. All that is required to effect a valid donation is the substantive requirements of a divestment and fulfillment of donative intent. *Broussard*, *supra*.

Wanda urges that, since all shares of Aeon PEC that had been issued in Ronnie's name were community property, when he signed Certificate No. 1023 that cancelled the 823 shares, then signed the certificates that show 500 shares in Wanda's name, he donated the shares to Wanda, making them her separate property under La. C.C. art. 2343.

*Analysis*

It is undisputed that there is no authentic act of donation in this case, nor is there a written act indicative of Ronnie's donative intent. By their inherent nature, ***incorporeal*** movables cannot be donated by manual

10

delivery.[8]  Furthermore, there was no testimony, live or by deposition; instead, the parties chose to present this matter to the trial court for a determination of whether a donation took place based upon written stipulations and documentary evidence in the form of exhibits.  The trial court based its determination that Ronnie had the intent to donate the shares of stock to Wanda based on: the Aeon PEC Certificate No. 1025 issued in Wanda's name; that "[Ronnie] voided Certificate No. 1023, issued Certificate No. 1025 showing five hundred (500) shares in Wanda's name, and recorded the transaction on the company's books"; the marital relationship between Ronnie and Wanda; Wanda's degree of involvement in the corporate affairs of Aeon PEC; and Ronnie's last will and testament.

We will examine each of these to see whether the trial court erred in finding that Wanda established by clear and convincing evidence that Ronnie had the requisite donative intent to transform his community interest in the shares of stock into the separate property of his wife Wanda.

**(1)  Aeon PEC Certificate No. 1025**.  This certificate was allegedly signed by Ronnie as President and Wanda as Treasurer of Aeon PEC, and shows that there are 500 shares of stock in Wanda's name; it is in the same form as Aeon PEC Certificate No. 1026 which shows 323 shares of stock in Ronnie's name.  The trial court found that nothing more was required to transfer shares of stock under the Louisiana Commercial Laws, La. R.S. 10:8-101 et seq., and that the donation from Ronnie to Wanda was valid in

---

[8] *Cf. Succession of Dauterive*, *supra* (in which the Fourth Circuit held that the electronic transfer of funds from the donor's bank account to the donee's separate bank account was a manual gift and thus the authentic act requirement for a valid donation *inter vivos* did not apply; the funds were converted to a corporeal movable once they were electronically transferred into the donee's separate account, and the withdrawal of the funds by electronic transfer met the requirements for the manual delivery of a corporeal movable).

form under the first paragraph of La. C.C. art. 1550. This is only partially correct.

What the trial court possibly got right was that the parties appear to have complied "with the requirements otherwise applicable to the transfer of that particular kind of incorporeal immovable." As noted above, there was no authentic act, and there is no writing signed by Ronnie evidencing donative intent directing the transfer of the shares to Wanda or to her account or for her benefit. The signing of Certificate No. 1025 does not constitute evidence of a transfer of the 500 shares to Wanda's separate estate, and it likewise cannot be proof of donative intent by Ronnie.[9] Neither Wanda nor the trial court considered Certificate No. 1026 as proof of either a transfer and donation of the 323 community shares to Ronnie or as evidence of donative intent by Wanda to transfer those 323 shares to Ronnie's separate estate. The trial court made a legal error in treating these two transactions differently. Wanda can't have it both ways. Either both were donations or neither were.[10]

**(2) The determination that Ronnie voided Certificate No. 1023, issued Certificate No. 1025 showing 500 shares in Wanda's name, and recorded the transaction on Aeon PEC's books.** According to Cory/Executor, there is absolutely no evidence in this record to support the

---

[9] A stock certificate is merely evidence of ownership of the stock, and is not in reality the subject of the ownership, to wit: the shares of stock. *Succession of McGuire*, 151 La. 514, 92 So. 40 (La. 1922); *Hartnet v. LGD Properties, Inc.*, 99-2539 (La. App. 4 Cir. 5/3/00), 767 So. 2d 88, *writ denied*, 00-2626 (La. 11/17/00), 774 So. 2d 976; *Ackel v. Ackel*, 595 So. 2d 739 (La. App. 5 Cir. 1992). A stock certificate is prima facie evidence of corporate ownership, but it is to be distinguished from actual ownership which is to be determined from all of the facts and circumstances of a case. *Fireplace Shop, Inc. v. Fireplace Shop of Lafayette, Inc.*, 400 So. 2d 702 (La. App. 1 Cir. 1981).

[10] This Court is not suggesting that the 323 shares of stock in Ronnie's name are in fact his separate property, just making a point about the disparate treatment of what appear to be identical transactions.

12

trial court's finding that it was Ronnie who voided Certificate No. 1023, issued Certificate No. 1025 in Wanda's name, then recorded the transaction in the company's books. We agree, having closely examined this record. The following facts were stipulated on this issue:

- Exhibit J-1, ¶ 59: "Certificate No. 1025 shows 500 shares of Aeon PEC stock in Wanda's name. Certificate No. 1026 shows 323 shares of Aeon PEC stock in Ron's name."

- Exhibit J-1, ¶ 58: Wanda had created a spreadsheet, introduced into evidence as Exhibit P-41, and attached to a deposition of Wanda as Exhibit Goodman 51 (**the deposition was not introduced**); "Wanda has produced records concerning the ownership of Aeon PEC's stock. One such record is a spreadsheet or ledger that Wanda created. In her deposition, Wanda testified that she created Deposition Exhibit Goodman 5a."

While both Ronnie and Wanda signed the new certificates, there is no evidence whatsoever to show who, in accordance with the company's bylaws, voided Certificate No. 1023, issued Certificate No. 1025 in Wanda's name, or recorded the transaction in the company's books. The spreadsheet is a breakdown of various stock transactions by Ronnie Goodman between the dates of 11/13/2012 and 1/10/2016 and a list of the persons in whose names the shares of Aeon PEC stock were currently issued as of the date of Wanda's deposition. This spreadsheet, without more, is not indicative of Ronnie's donative intent.

(3) **The marital relationship between Ronnie and Wanda.** The only evidence the trial court had on this issue was the stipulation that they were married on September 5, 1998. The fact of Ronnie and Wanda's marriage, *without more*, is insufficient evidence of donative intent.

(4) **Wanda Goodman's degree of involvement in the corporate affairs of Aeon PEC.** Even if we were to find sufficient proof in this record of Wanda's participation in the corporate affairs of Aeon PEC (which we do

13

not), there is no connexity between *her* "heav[y] involve[ment] in the direction and management of Aeon PEC" and a donative intent on the part of *Ronnie*. This factor is of no help to Wanda in proving that Ronnie had donative intent.

**(5) Ronnie's last will and testament.** While this matter *is* the Succession of Ronnie Mack Goodman, the decedent's last will and testament was not introduced into evidence on the trial of the ownership of the 500 shares of Aeon PEC stock. The basis for Wanda's claim that Ronnie donated the stock does not arise out of Ronnie's testament, but from Ronnie's act of putting Wanda's name on 500 shares in Certificate No. 1025. We do not believe that the decedent's last will and testament helps Wanda with her burden of proof in this case.

The legislature made it fairly easy for a donor of incorporeal movables to establish donative intent that is almost impossible to assail or second-guess—in an authentic act (*see*, ¶ 1, La. C.C. art. 1550) or in a writing signed by the donor that evidences donative intent and directs the transfer of the property to the donee or his account or for his benefit (*see* ¶ 2, La. C.C. art. 1550). Article 1550 contemplates a third means, i.e., compliance with the requirements otherwise applicable to the transfer of that particular kind of incorporeal immovable (*see*, ¶ 1), *but there nonetheless must be clear and convincing evidence of both divestment and donative intent at the time of the donation. See, La. C.C. art. 1468.* Under the facts and circumstances of this case, and in light of the above, we conclude that the trial court erred in finding that Ronnie had the requisite donative intent, and that he donated the stock in Aeon PEC to Wanda simply by transferring the shares to Wanda's name on January 10, 2016.

14

## CONCLUSION

For the reasons set forth above, Part I of the trial court's Judgment on Classification and Ownership of Stock declaring that the 500 shares of stock in Aeon PEC stock evidenced by Certificate No. 1025, Exhibit P-44, became the separate property of Wanda Goodman as a result of a donation is hereby REVERSED; Part III of the trial court's Judgment on Classification and Ownership of Stock declaring that the ownership of the 823 shares of stock in Aeon PEC evidenced by Certificate Nos. 1025 and 1026, Exhibits P-44 and P-45, are to be divided with Cory Goodman receiving 161.5 shares of stock and Wanda Goodman receiving 661.5 shares of stock, is hereby AMENDED.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there is judgment:

I.      declaring that the 500 shares of stock in Aeon PEC evidenced by Certificate No. 1025, Exhibit P-44, in the name of Wanda Coy Goodman, is property of the community of acquets and gains which formerly existed between Ronnie Mack Goodman and Wanda Coy Goodman;
. . .

III.      declaring that the ownership of the 823 shares of stock in Aeon PEC evidenced by Certificate Nos. 1025 and 1026, Exhibit Nos. P-44 and P-45, are to be divided, with Cory Goodman receiving 411.5 shares of stock in Aeon PEC and Wanda Coy Goodman receiving 411.5 shares of stock in Aeon PEC.

Costs are assessed against appellee, Wanda Coy Goodman.

REVERSED IN PART; AMENDED IN PART; ORDERED, ADJUDGED, and DECREED.

15